**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **FINN CORPORATION** | : | Case No. 1:25-cv-00418-JPH |
| 9281 LeSaint Drive | : | |
| Fairfield, Ohio 45014, | : | Judge Jeffrey Paul Hopkins |
| | : | |
| **EXPRESS BLOWER INC.** | : | |
| 9281 LeSaint Drive | : | |
| Fairfield, Ohio 45014, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **AMENDED COMPLAINT** |
| v. | : | |
| | : | |
| **PRECISION MACHINE &** | : | **JURY TRIAL DEMANDED** |
| **MANUFACTURING, INC.** | : | |
| 1290 S. Bertelsen Road | : | |
| Eugene, Oregon 97402 | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

Now come Plaintiffs, Finn Corporation ("Finn") and Express Blower Inc. ("Express Blower") (collectively "Plaintiffs"), by and through counsel, and for their Amended Complaint against Precision Machine & Manufacturing, Inc. ("PMM"), allege and state as follows:

**PARTY IDENTIFICATION AND JURISDICTION**

1.      Plaintiff Finn is a corporation organized and existing under the laws of the state of Ohio with a principal place of business in Ohio.

2.      Plaintiff Express Blower is a corporation organized and existing under the laws of the state of Ohio with a principal place of business in Ohio.

3.      Defendant PMM is a corporation organized and existing under the laws of the state of Oregon with a principal place of business in Oregon.

1

4. This Court has subject matter jurisdiction over the claims in this case because Counts Two and Four of this Amended Complaint state claims under federal law, giving rise to federal question subject matter jurisdiction.

5. This Court also has subject matter jurisdiction over Counts One, Three, and Five in of this Amended Complaint because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

6. To the extent required, this Court further has supplemental jurisdiction over Plaintiffs' claims under state law, pursuant to 28 U.S.C. § 1367, as such claims are so related to Plaintiffs' federal claims that they form the same case and controversy between the parties.

7. This Court has specific personal jurisdiction over PMM because PMM purposefully availed itself of the state of Ohio by contracting with Plaintiffs, with their principal place of business in Ohio, and because PMM breached the contracts at issue here through actions aimed at Ohio, and because the trade secrets subject to Plaintiffs' trade secret claim originated in Ohio.

8. Venue is proper in this Court because, among other reasons, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in and/or were directed at Plaintiffs located within this judicial district, which is where Plaintiffs' corporate headquarters are located. Further, one or more representatives of PMM have personally visited this judicial district for purposes of conducting business with one or more of the Plaintiffs.

## FACTS COMMON TO ALL COUNTS

9. Plaintiffs incorporate the preceding allegations as if fully rewritten here.

### A. Plaintiffs, their Trademarks, and the Blower Products they Pioneered

10. In 1935, Charles Finn invented a revolutionary machine that chopped and applied straw for mulching freshly seeded soil to protect it from rain and wind erosion. Based just north

2

of Cincinnati, Ohio, his idea and small shop were the catalysts for a new industry of labor-saving equipment in the soil and ground preservation space. Following the straw blower, Finn invented the first hydroseeder in 1953. This machine was a highly efficient way to spray seed and fertilizers over broad areas.

11.     In 1993, Finn received a patent on the original-designed Bark Blower. Finn was, has been, and is the first, trusted, and best in this product offering and machine category.

12.     Today, customers still look to Finn for equipment of superior performance and quality. They trust Finn because of its experience and commitment to being their project solution and because of Finn's comprehensive product support. Finn prides itself on manufacturing hydroseeders, bark blowers, and straw blowers that give customers the ability to work more profitably by completing more jobs at less cost. Finn has a worldwide presence with more than 175 dealer and service locations in North America, Australia, South America, Africa, and Europe.

13.     Express Blower is a wholly-owned subsidiary of Finn.

14.     Express Blower is the world's leading manufacturer and distributor of large pneumatic blowing equipment. Invented more than 75 years ago, Express Blower owners provide material delivery and installation to the erosion control, green roof, construction, landscape, playground and agricultural industries. strive to provide superior equipment and customer support to their customers. Express Blower remains the leader and the innovator in the blower truck industry. Its experience in the manufacture, operation, and business aspect of the industry sets Express Blower apart. Express Blower trucks are capable of spreading a wider range of products for a wider variety of applications than any other blower trucks on the market today.

15.     Express Blower provides factory-direct sales to allow customers to work directly with the people who know blower trucks and the business best. Express Blower also provides

dedicated and knowledgeable parts and service staff available to help customer maintain productivity, as well as an extensive parts inventory for rapid delivery.

16.     Throughout its existence, Finn has also expended considerable resources in establishing a brand under its name, consistently promoting its products under the Finn name and developing the brand to where consumers instantly recognize the name "Finn" as an indicator that Finn is the source of those products.

17.     From these activities and the consuming public's recognition of the Finn name, Finn has cultivated strong common law trademark rights in the name "Finn," as used in connection with, and affixed to, its blower and hydroseeder products.

18.     One such example of Finn's use of its name in connection with its products is pictured below, showing Finn's affixation of its name to its MBH6 Material Blower system:



19.     Similarly, Express Blower has expended considerable resources in establishing a brand under its name, consistently promoting its products under the Express Blower name and developing the brand where consumers instantly recognize the name "Express Blower" as an indicator that Express Blower is the source of those products.

20.     From these activities and the consuming public's recognition of the Express Blower name, Express Blower has cultivated strong common law trademark rights in the name "Express Blower," as used in connection with pneumatic blowing equipment.

21.     One such example of Express Blower's use of its name in connection with its products is pictured below, showing Express Blower's affixation of its name to its EB-60 system:



22.     In fact, Finn and Express Blower's names are so synonymous with their products that, as the only producer of such machines in the industry, consumers and those in the commercial landscaping industry understand the term "blower truck," to refer to a product of Express Blower and Finn.

23.     Plaintiffs also possess a number of related trademark registrations, including, but not limited to the following: EXPRESS BLOWER (U.S. Reg. No. 2857862), TERRASEEDING (U.S. Reg No. 2741024), the EXPRESS BLOWER design logos (U.S. Reg. No. 2417448), the

HYDROSEEDER design logo (U.S. Reg. No. 697083), FINN LANDFILL SOLUTIONS (U.S. Reg. No. 3118154), and the FINN design logo (U.S. Reg. Nos. 1176903 and 1287524).

24. Finn and Express Blower have consistently innovated to further develop their blower systems for better performance and efficiency, designing, prototyping, testing, and commercializing ever-improved models of blower products designed to, through pneumatic (air) pressure, apply a variety of materials, such as mulch, composts, soil blends, aggregates, and seeds over a desired surface area by blowing such material through a hose attached the blower machine.

**B.    Finn's and Express Blower's Systems, their Feeder Components, and Finn's and Express Blower's Related Trade Secrets.**

25. The device at the center of Finn's and Express Blower's systems products is the blower system, which, with the drive of a prime mover (a compression or combustion engine), applies the pneumatic pressure to the material input to blow the material through the connected hose as an operator directs the open end of the hose to place the material in desired areas at an efficient and consistent rate, so as to allow the operator to spread the material over a large surface area.

26. The blower system consists of a number of components, including, relevant to this case, a feeder—also known as an "airlock" or a "rotary air valve."

27. The feeder serves two primary functions: (1) to meter the flow of conveyed material into the pressurized air stream, which conveys that material through the hose to the application target; and (2) to maintain the desired pressure differential between the pressurized air stream and ambient air.

28. To accomplish these functions to the standards established by Finn and Express Blower and expected by their customers, for each model Finn and Express Blower offer, the feeder

6

must adhere to particular specifications developed by Finn and Express Blower as part of the design of those feeders (the "Feeder Specs").

29. The Feeder Specs consist of a set of performance minimums and compatibility requirements that an feeder must satisfy to (a) to ensure the feeder can best serve its purpose in the system and (b) to ensure that the feeder performs in a manner best suited for optimized interaction with other components of the system, each of which has its own set of performance specifications for best fit within the system.

30. Because the Feeder Specs serve these purposes, inclusion of a feeder that meets the Feeder Specs is critical to performance, efficiency, and lifespan of the product as a whole.

31. If the feeder does not meet the Feeder Specs, the feeder will not sufficiently meter the amount of material relative to the amount of pressurized air flowing through it, leading to either too much material flowing through the system (leading to excessive component wear and potential clogging) or too little (leading to unsatisfactory inefficiency).

32. Similarly, if the feeder does not meet the Feeder Specs, the feeder will also fail to properly maintain the pressure differential between the pressurized system and the ambient air, causing a danger of rapid and uncontrolled blasting of material through the feeder's input, which can pose a significant safety and damage hazard both to the system itself and surrounding areas.

33. Like other components of the complete system, the feeder's performance is critical to the performance of the other components and the efficacy of the system as a whole.

34. Therefore, as part of the design process of each component in the full system, Finn and Express Blower have developed performance criteria for each component, including the Feeder Specs.

35. These criteria, including the Feeder Specs, are the result of Finn and Express Blower's significant investments of time, money, and other resources in designing, prototyping, testing, redesigning, and commercializing each component part.

36. Through such processes, Finn and Express Blower develop the performance criteria required of each system component, based both on the function of each component itself and the demands created by other components' performance.

37. As such, development of any one components' performance criteria, including the Feeder Specs, requires similar development of other components of the system, where such components and the airlock depend on each other.

38. Those sets of criteria, including the Feeder Specs, are essential to producing components and parts that allow for Finn's and Express Blower's systems to perform as their customers have come to expect and to a level satisfactory of Finn's and Express Blower's rigorous standards.

39. Without such criteria, a producer would be unable to produce components that are optimized for use within the complete systems produced by Finn and Express Blower and would be unable to produce components that perform to the standard set by the full systems sold by Finn and Express Blower.

40. These criteria, including the Feeder Specs, are proprietary and secret. Finn and Express Blower do not publish them to the public, nor do they make them available to outside parties other than, as needed, to parts suppliers, should Finn or Express Blower decide to outsource production of that particular part.

41. Accordingly, by virtue of being secret and not generally known by the public, the Feeder Specs provide significant economic value to Finn and Express Blower.

42. Finn and Express Blower maintain their design and manufacturing data, including the Feeder Specs, on a specific server maintained for the purpose of storing such data. Finn and Express Blower restrict access to that server to its engineering staff and other approved employees involved in key manufacturing or sourcing roles.

43. Finn and Express Blower are the sole producers of their complete systems and produce many of the component parts of those systems.

44. To complement that production and streamline supply, Finn and Express Blower outsource supply of particular parts to select third-party suppliers for Finn and Express Blower to implement into complete systems.

45. When Finn and Express Blower choose to outsource supply of particular parts of its systems, it qualifies those suppliers through rigorous scrutiny of that supplier and its ability to produce parts up to Finn and Express Blower standards. This process includes an in-person meeting at Finn and Express Blower's headquarters in Fairfield, Ohio and review of the supplier's financial stability, manufacturing capabilities, and quality control systems and standards.

46. Once a supplier is qualified and contracted to supply certain parts, Finn and Express Blower provide—for the part(s) that supplier will supply—its design data, specifications, drawings, and other relevant design information to the supplier, so that the supplier can provide those parts as designed.

47. Finn and Express Blower's agreements with such suppliers include confidentiality terms that provide for the protection of this information, prohibiting the supplier from disclosing such information to others, or using that information for purposes other than the supply of the relevant parts to Finn and Express Blower.

48.     As described below, Finn and Express Blower's relationship with PMM was one such supplier relationship.

## C.     Plaintiffs' Relationship with PMM

49.     PMM began as a small machine shop. PMM now markets itself as a manufacturer of parts such as rotary airlock feeders, rotary valve airlocks, and screw conveyors for industrial manufacturing operations in various industries.

50.     Finn and Express Blower selected PMM as a vendor to supply components for their blower truck product lines, subject to Finn and Express Blower's designs. Specifically, PMM was selected to manufacture feeders for Finn and Express Blower's blower truck product lines.

51.     After prior, limited business dealings between Express Blower and PMM, the parties began discussing this business relationship in approximately 2015, with new leadership at PMM representing PMM in those discussions.

52.     On or about February 8, 2016, Finn, Express Blower, and PMM entered into a Memorandum of Understanding ("MOU") to establish terms under which PMM would provide feeders for Finn and Express Blower's blower truck product lines. A true and correct copy of the MOU is Exhibit 1 to this Complaint.[1]

53.     Pursuant to the terms of the MOU, PMM agreed that "[u]pon commencement of the business relationship" with Finn and Express Blower, PMM would "withdraw from the business of supplying feeders into the blower truck aftermarket." (Exhibit 1 at pg. 3.)

---

[1] However, because the MOU contains certain information regarding pricing, volumes, and other topics that the parties to the MOU agreed they would keep confidential, Plaintiffs are filing a Motion for Leave to file the MOU under seal, and will submit the MOU as appropriate under that procedure. While Plaintiffs similarly filed for leave to file the MOU under seal in association with their original Complaint (*see* [ECF No. 2]), that motion remains pending as of the date of filing of this Amended Complaint. To avoid confusion, Plaintiffs will file another motion for leave in association with this Amended Complaint.

54.     PMM further agreed that it would "remove references to blower truck feeders from its website, brochures, and other marketing materials" and "direct any customer inquiries that it receives" to Finn and Express Blower. (Exhibit 1 at pg. 3.)

55.     The parties agreed that, so long as they were both satisfied with the business relationship and the annual minimum volume was met, as established in the MOU, PMM would "stay out of the blower truck feeder aftermarket and not compete with Finn and [Express Blower] for blower truck feeder sales, parts sales, service, or rebuilding." (Exhibit 1 at pg. 3.)

56.     The parties further agreed that "[i]f the working relationship between the companies ever comes to an end, [PMM] commits to remaining out of the aftermarket business for a minimum of two years following the date of its last shipment." (Exhibit 1 at pp. 3-4)

57.     Finally, both parties agreed "to protect the confidentiality of the designs, the pricing, volumes, and any other information about their business relationship with the same care that they safeguard other information about their respective businesses." (Exhibit 1 at pg. 4.)

58.     The MOU was duly executed by Matt Day, Vice President of Operations for Finn and Express Blower at the time, and Kirk Morton, President of PMM at the time. (Exhibit 1 at pg. 4.)

59.     Additionally, on or about February 9, 2016, Plaintiffs entered into a "Non-Disclosure/Confidentiality Agreement" ("NDA") with PMM. The NDA clearly identifies PMM as the "Recipient" of Plaintiffs' proprietary information, provided for the "Purpose" of "preparing an estimate (or engaging in discussion) or creation of documentation for any potential Services, Supplies, Products, Equipment, or modification of Products or Equipment."

60.     In the NDA, PMM agreed that it would (a) not use or duplicate Plaintiffs' proprietary information for any reason beyond the Purpose; (b) protect and keep Plaintiffs'

11

proprietary information in confidence; (c) only disclose Plaintiffs' proprietary information to its employees and agents on a need-to-know basis; and (d) not reverse engineer any products (hardware or software) received from Plaintiffs.

61.     The NDA also was duly executed by Mr. Day and Mr. Morton.

62.     After signing the MOU and NDA, and over the course of the ensuing relationship between the parties, Finn and Express Blower provided the necessary confidential design information and data relevant to the supply of feeders, including Feeder Specs, to PMM.

63.     PMM then began to supply Finn and Express Blower with rotary feeders for their blower trucks, which were manufactured using Finn and Express Blower's designs, informed by the information supplied by Finn and Express Blower, including the Feeder Specs.

64.     Specifically, Finn and Express Blower provided PMM with such information for the following feeder/airlock models:

| Model Name | Rotor Size | Compatible Finn/ Express Blower Systems |
|---|---|---|
| Series 3 Feeder | 18 X 25 | All EB/TM/TR models |
| Series 6 Feeder | 18 X 28 | All EB/TM/TR models |
| Series 5 Feeder | 18 X 28 | All EB/TM/TR models |
| BB302 Airlock | 14 X 17 | Finn BB302 |
| MBH6 Airlock | 16 X 25 | MBH6, 5 Series |
| MBH6 Airlock | 16 X 25 | MBH6, 5 Series |
| MBX Airlock | 18 X 33 | MBX, 12 Series |
| MBX Airlock | 18 X 33 | MBX, 12 Series |
| MBL1 Airlock | 12 X 15 | MBL1 |
| MBM3 Airlock | 14 X 17 | MBM3 |

65.     Upon receipt, PMM used this information to produce each of these feeder models for sale to Finn and Express Blower and Finn/Express Blower's implementation into full systems.

66.     Finn and Express Blower have continued to make at least the required minimum purchases from PMM for each calendar year, in accordance with the MOU. Typically, the amount of purchases each calendar year have greatly exceeded the required minimum amount.

67.     However, Plaintiffs have recently learned that PMM has been marketing and selling in the aftermarket what PMM is holding out as "OEM" replacement parts for Finn and Express Blower machines. To market and sell these parts, which PMM manufacturers, PMM has been using Finn's name explicitly, as well as phrases that can refer only to Finn and Express Blower's products, such as "blower truck," without Finn's permission or authorization.

68.     PMM's unauthorized advertisements for these aftermarket replacement parts, which have so far been placed on social media outlets, are accompanied by images of Finn and Express Blower's products. A true and correct copy of one such example is attached as Exhibit 2.

69.     In Exhibit 2, PMM directs the advertisement to "all Finn Blower Truck Customers" and asserts that PMM is providing them "direct aftermarket access" to "Blower Truck Rotary Feeders and Parts" and that such parts are being provided "factory direct" and are "brand new factory" parts.

70.     Exhibit 2 also shows additional instances of PMM's use of Finn's name to advertise and promote its unauthorized aftermarket products.

71.     PMM did not inform Finn and Express Blower at any point that PMM was intending to or had begun using their companies' trademarks for PMM's own profit. Nor did PMM inform Finn and Express Blower at any point that PMM was intending to or had begun offering for sale replacement parts for Finn and Express Blower machines.

72.     Finn and Express Blower never gave PMM permission or authorization to sell in the aftermarket or use their trademarks to sell in the aftermarket the blower truck parts that PMM

has made specifically for Finn and Express Blower over the years. Nor has Finn or Express Blower ever authorized PMM to use any information provided to PMM, including but not limited to the Feeder Specs, for any purpose other than for supply of particular feeders to Finn and Express Blower.

73. PMM could not have produced, and did not produce, the feeders it has offered and now offers in the aftermarket without using the proprietary, confidential information Finn and Express Blower provided to PMM before PMM began providing those parts to Finn and Express Blower, including the Feeder Specs.

74. Additionally, upon information and belief, due to PMM's marketing and attempts to sell these products, there is significant risk that any purchasers of PMM's parts will believe they are purchasing blower truck replacement parts authorized by Finn and Express Blower to be sold in the aftermarket by PMM.

75. By marketing and selling Finn and Express Blower replacement parts in the aftermarket, PMM has breached its contractual obligations to Finn and Express Blower, falsely designated the origin of those parts, and misappropriated the Finn and Express Blower's trade secrets to do so.

76. Soon after learning this information regarding PMM's conduct, Finn and Express Blower sent PMM a cease and desist letter on May 15, 2025. Therein, Finn and Express Blower demanded that PMM cease and desist in selling in the aftermarket and in using Finn and Express Blower's name, product names, and other intellectual property as described above.

77. PMM has refused to comply with Finn and Express Blower's cease and desist letter and are knowingly and intentionally continuing to violate Finn and Express Blower's rights and the terms of the MOU.

## COUNT ONE
## BREACH OF CONTRACT
### (Memorandum of Understanding)

78. Plaintiffs incorporate the preceding allegations as if fully rewritten here.

79. Finn, Express Blower, and PMM entered into the MOU freely and without duress.

80. The MOU constitutes a valid and legally enforceable contract that Finn and Express Blower are entitled to enforce, because they have at all times complied with their obligations under the MOU. However, due to PMM's breaches as described further below, PMM has waived and cannot seek to enforce any alleged rights that PMM may claim to have under the MOU.

81. In exchange for PMM's commitment to be bound by the MOU, Finn and Express Blower provided PMM with adequate and sufficient consideration, including access to Finn and Express Blower's confidential information, processes, and designs, and making at least the minimum purchases from PMM for each calendar year. As a result, PMM's business grew and Finn and Express Blower, upon information and belief, became PMM's largest customers.

82. Finn and Express Blower fully performed their obligations under the MOU.

83. PMM has breached the MOU by, among other things, marketing and selling Finn and Express Blower replacement parts in the aftermarket (including those that PMM is holding out as "OEM" replacement parts) and using Finn and Express Blower's confidential and proprietary designs for its own benefit.

84. As a direct and proximate cause of PMM's breaches of the MOU, described above, Finn and Express Blower have suffered monetary damages in an amount to be proven at trial, exceeding $75,000.

85. Monetary damages alone will not be sufficient to remedy all of the harm caused to Finn and Express Blower by PMM's breach of the MOU. As a direct and proximate result of

PMM's conduct, Finn and Express Blower have suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

86.     Finn and Express Blower also are entitled to injunctive relief to prevent any such further unlawful conduct.

## COUNT TWO
## False Designation of Origin (15 U.S.C. § 1125(a))

87.     Plaintiffs incorporate the preceding allegations as if fully rewritten here.

88.     Finn and Express Blower have the exclusive rights to use and exploit their trademark rights they possess in their names, Finn and Express Blower, which serve as distinctive trademarks within the meaning of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), which are used as trademarks in interstate commerce for Finn and Express Blower's products and services, and which identify Finn and Express Blower as the exclusive source of goods and services offered thereunder (the "Marks").

89.     The Marks have been in use for many years and play a prominent role with respect to the marketing and advertising of Finn and Express Blower's products and services. The Marks have gained widespread recognition in Finn and Express Blower's industry and amongst the consumers of their products.

90.     The Marks were distinctive and well-known long before PMM began using unauthorized reproductions of the Marks to sell Finn and Express Blower's blower truck replacement parts for its own personal gain.

91.     PMM has infringed these rights by using the Marks in connection with its own personal sales of products created using, at least, Finn's name in advertising and promoting its unauthorized aftermarket products. PMM has done so without Finn's permission.

92. PMM's acts constitute trademark infringement, false designation of origin, false or misleading representation, false advertising, and false or misleading description which: (a) is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, right to use, or association of PMM with Finn and Express Blower and as to the origin, sponsorship, or approval of PMM's products, services, and commercial activities by Finn and Express Blower; and (b) in commercial advertising or promotion, misrepresent the nature, characteristics, qualities, or origin of Finn and Express Blower's products, services, or commercial activities and/or Finn and Express Blower's authorized products, services, or commercial activities.

93. PMM's actions constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a result of PMM's unlawful acts, PMM has been unjustly enriched, and Finn and Express Blower have been damaged.

94. PMM's unlawful activities have caused, and, unless enjoined by this Court, will continue to cause irreparable injury and other damage to Finn and Express Blower in terms of its business, reputation, and goodwill in the Marks. Finn and Express Blower have been damaged and believe they will continue to be damaged by PMM's false descriptions and representations through direct diversion of sales and/or through a lessening of goodwill associated with the Marks. PMM's acts also negatively impact Finn and Express Blower's standing and reputation in the industry by associating the company with PMM's inferior brand equity. Finn and Express Blower have no adequate remedy at law.

95. PMM's actions make this an exceptional case under 15 U.S.C. § 1117(a). Finn and Express Blower are entitled to, and hereby seek, an award of attorneys' fees and costs, pursuant to 15 U.S.C. § 1117(a).

## COUNT THREE
## Common Law Trademark Infringement

96.     Plaintiffs incorporate the preceding allegations as if fully rewritten here.

97.     The acts and omissions of PMM, as set forth above, including in Paragraphs 67–77, constitute common law trademark infringement.

98.     PMM, through the acts and omissions described above, have used and continue to use, in commerce words, terms, names, symbols, and devices which are confusingly similar to those of Finn and Express Blower, in a manner that is likely to cause confusion, including reverse confusion, or mistake or to deceive as to the affiliation, connection, or association of PMM with Finn and Express Blower, or as to the origin of PMM's goods or services or other commercial activities, or as to the sponsorship or approval of PMM's services or other commercial activities by Finn and Express Blower.

99.     PMM's unlawful activities have caused, and, unless enjoined by this Court, will continue to cause irreparable injury and other damage to Finn and Express Blower in terms of its business, reputation, and goodwill in the Marks. Finn and Express Blower have been damaged and believe they will continue to be damaged by PMM's false descriptions and representations through direct diversion of sales and/or through a lessening of goodwill associated with the Marks. PMM's acts also negatively impact Finn and Express Blower's standing and reputation in the industry by associating the company with PMM's inferior brand equity. Finn and Express Blower have no adequate remedy at law.

## COUNT FOUR
## Misappropriation of Trade Secrets – Defend Trade Secrets Act
(18 U.S.C. § 1836(b), *et seq.*)

100.     Plaintiffs incorporate the preceding allegations as if fully rewritten here.

101.     As discussed above, Finn and Express Blower have spent years developing proprietary information that allows for production of feeders optimized for use in its systems, including the Feeder Specs.

102.     The Feeder Specs constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

103.     The Feeder Specs are information with significant economic value, as without those performance criteria, a parts producer would be unable to produce feeders that perform so as to ensure optimum performance of that feeder within the larger, complete systems provided by Finn and Express Blower. This information derives independent economic value, both actual and potential, from not being generally known by or ascertainable through proper means by others, specifically persons or entities who might obtain economic value from their disclosure or use.

104.     At all times relevant hereto, as described above, Finn and Express Blower have taken steps to carefully guard such trade secrets.

105.     PMM has misappropriated Finn and Express Blower's trade secrets by improperly using those trade secrets—specifically the Feeder Specs—beyond how such use is allowed by the above-identified agreements between the parties. As such, PMM acquired Finn's and Express Blower's trade secrets under circumstances giving rise to a duty to maintain the secrecy of those trade secrets and to limit the use of those trade secrets, but used those trade secrets in an unauthorized manner, constituting misappropriation under 18 U.S.C. § 1839(5)(B)(ii)(II).

106.     On information and belief, PMM knew of its actions, alleged above, were improper, and its acts of misappropriation are willful, intentional, and purposeful, in disregard of Finn's and Express Blower's rights. Even after notification of such unlawful conduct, PMM continues to produce products that necessarily require use of Finn and Express Blower's trade secrets.

107.    Based on their misappropriation, Finn and Express Blower are entitled to recover profits attributable to PMM's misappropriation in an amount to be proved at trial.

108.    PMM's misappropriation has proximately caused damage to Finn and Express Blower, including but not limited to, loss of profits, goodwill, competitive advantage, and business opportunities.

109.    PMM's actions in misappropriating Finn and Express Blower's trade secrets are willful, malicious, and were done with the intent to injure Finn and Express Blower and improve PMM's own economic opportunities, thereby justifying an award of punitive damages under 18 U.S.C. § 1836 (b)(3)(C) and attorney's fees under 18 U.S.C. § 1836 (b)(3)(D).

110.    PMM has been unjustly enriched as a further proximate result of its misappropriation of Finn and Express Blower's trade secret information.

111.    As discussed above, PMM's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Finn and Express Blower great and irreparable injury that cannot fully be compensated or measured in money. Finn and Express Blower have no adequate remedy at law for such injury and are entitled to preliminary and permanent injunctions prohibiting further misappropriation of its trade secrets.

## COUNT FIVE
### Misappropriation of Trade Secrets – Ohio Uniform Trade Secrets Act
(O.R.C. § 1333.61 *et seq*)

112.    Plaintiffs incorporate the preceding allegations as if fully rewritten here.

113.    As alleged above, the Feeder Specs (i) derive independent value, actual and potential, from not being generally known by or ascertainable through proper means by others, specifically persons or entities who might obtain economic value from their disclosure or use; and (ii) are subject to efforts by Finn and Express Blower that are reasonable under the circumstances to maintain their secrecy. Therefore, they constitute trade secrets under O.R.C. § 1333.61(D).

114. PMM has misappropriated Finn and Express Blower's trade secrets by improperly using those trade secrets—specifically the Feeder Specs—beyond how such use is allowed by the above-identified agreements between the parties. As such, PMM acquired Finn's and Express Blower's trade secrets under circumstances giving rise to a duty to maintain the secrecy of those trade secrets and to limit the use of those trade secrets, but used those trade secrets in an unauthorized manner, constituting misappropriation under O.R.C. § 1333.61(B)(2)(b).

115. On information and belief, PMM knew of its actions, alleged above, were improper, and its acts of misappropriation are willful, intentional, and purposeful, in disregard of Finn's and Express Blower's rights. Even after notification of such unlawful conduct, PMM continues to produce products that necessarily require use of Finn and Express Blower's trade secrets.

116. PMM's misappropriation has proximately caused damage to Finn and Express Blower, including but not limited to, loss of profits, goodwill, competitive advantage, and business opportunities.

117. Based on their misappropriation, Finn and Express Blower are entitled to recover damages for that misappropriation, including the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss, or, at least, a reasonable royalty that is equitable under the circumstances

118. PMM's actions in misappropriating Finn and Express Blower's trade secrets are willful, malicious, and were done with the intent to injure Finn and Express Blower and improve PMM's own economic opportunities, thereby justifying an award of exemplary damages under O.R.C. § 1333.63.

119. As discussed above, PMM's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Finn and Express Blower great and irreparable injury that

cannot fully be compensated or measured in money. Finn and Express Blower have no adequate remedy at law for such injury and are entitled to preliminary and permanent injunctions prohibiting further misappropriation of its trade secrets under O.R.C. § 1333.62.

## COUNT SIX
### Deceptive Trade Practices – Ohio Deceptive Trade Practices Act
(O.R.C. § 4165.01 *et seq*)

120.    Plaintiffs incorporate the preceding allegations as if fully rewritten here.

121.    The acts and omissions of PMM, as set forth above, including in Paragraphs 67–77, constitute acts that cause likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; cause likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; and representations that PMM's goods or services have sponsorship or approval that they do not have or that PMM has sponsorship, approval, status, affiliation, or connection that PMM does not have.

122.    Such acts therefore constitute deceptive trade practices prohibited by O.R.C. § 4165.02(2), § 4165.02(3), and § 4165.02(7).

123.    Finna and Express Blower are entitled to actual damages resulting from these deceptive trade practices under O.R.C. § 4165.03(A)(2).

124.    Finn and Express Blower are damaged and irreparably harmed by these deceptive trade practices, for which they have no adequate remedy at law. They are entitled to preliminary and permanent injunctions prohibiting further deceptive trade practices under O.R.C. § 4165.03(A)(1).

## COUNT SEVEN
### Unfair Competition

125.    Plaintiffs incorporate the preceding allegations as if fully rewritten here.

126. PMM's false designations of origin, as alleged herein, have caused a likelihood of confusion regarding sponsorship, affiliation, or connection between PMM on one hand and Finn and Express Blower on the other.

127. As PMM is manufacturing unauthorized aftermarket parts for Finn's and Express Blower's systems, PMM's goods are related to Finn's and Express Blower's goods, such that the confusion alleged above is likely.

128. PMM's unlawful activities have caused, and, unless enjoined by this Court, will continue to cause irreparable injury and other damage to Finn and Express Blower in terms of its business, reputation, and goodwill in the Marks. Finn and Express Blower have been damaged and believe they will continue to be damaged by PMM's false descriptions and representations through direct diversion of sales and/or through a lessening of goodwill associated with the Marks. PMM's acts also negatively impact Finn and Express Blower's standing and reputation in the industry by associating the company with PMM's inferior brand equity. Finn and Express Blower have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgement against PMM as follows:

A. That PMM has breached the MOU;

B. That PMM's use of the Marks constitutes false designation of origin under 15 U.S.C., § 1125(a)(1)(A), common law trademark infringement, deceptive trade practices, and unfair competition;

C. That PMM's use of Finn's and Express Blower's trade secrets constitutes misappropriation of those trade secrets under 18 U.S.C. § 1836(b), *et seq.* and O.R.C. 1333.61 *et seq*;

D.      Permanently enjoining PMM, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise:

      i.      Restricting PMM from breaching the provisions of the MOU, namely by selling or offering for sale aftermarket parts for Finn or Express Blower products;

      ii.      restricting from making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (1) PMM's goods are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Finn or Express Blower, or that (2) Finn or Express Blower's goods are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with PMM;

      iii.      restricting from using or authorizing any third party to use any or false designation of origin or any marks, names, words, symbols, devices, or that falsely associate such business, goods and/or services with Finn or Express Blower or tend to do so;

      iv.      directing PMM to immediately cease all display, distribution, marketing, advertising, promotion, sale, offer for sale, and/or use of any and all packaging, labels, advertisements, signs, displays, and other materials that feature or bear any Mark owned by Finn or Express Blower;

v.      restricting PMM from disclosing, using, or otherwise misappropriating Finn and Express Blower's trade secrets, including at least the Feeder Specs; and

vi.     restricting from aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (i) through (v).

E.     Directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), PMM to file with the Court and serve upon Plaintiffs' counsel within thirty (30) days after service on PMM of an injunction in this action, or such extended period as the Court may direct, a report in writing under oath, setting forth in detail the manner and form in which PMM has complied therewith;

F.     Awarding Finn and Express Blower their actual damages and PMM's profits in an amount to be proven at trial;

G.     Awarding Finn and Express Blower an amount up to three times the amount of its actual damages, in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a));

H.     Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding Finn and Express Blower their costs and reasonable attorneys' fees thereunder, pursuant to 15 U.S.C. § 1117(a);

I.     Awarding Finn and Express Blower punitive damages under 18 U.S.C. § 1836 (b)(3)(C) and attorney's fees under 18 U.S.C. § 1836 (b)(3)(D).

J.     Awarding Finn and Express Blower exemplary damages under O.R.C. § 1333.63.

K.     Awarding Finn and Express Blower interest, including prejudgment and post-judgment interest, on the foregoing sums; and

L.     Awarding such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury on all issues arising in this action so triable.

Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/ Michael A. Xavier*
Matthew J. Bakota (0079830)
Emily M. Snively (0104656)
1 South Main Street, Suite 1300
Dayton, Ohio 45402
Phone: (937) 449-6400
Fax: (937) 449-2836
matthew.bakota@dinsmore.com
emily.snively@dinsmore.com

Michael A. Xavier (0097121)
1775 Sherman St., Suite 2600
Denver, CO 80209
Phone: (303) 296-3996
michael.xavier@dinsmore.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 28, 2025, the foregoing was served on all counsel of record by the Court's ECF electronic filing system, as provided by Federal Rule of Civil Procedure 5(b)(2)(E).

<u>/s/ Michael A. Xavier   </u>