IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| FINN CORPORATION, *ET AL.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:25cv418 |
| | ) | Judge Jeffery P. Hopkins |
| v. | ) | |
| | ) | |
| PRECISION MACHINE & | ) | |
| MANUFACTURING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT PRECISION MACHINE & MANUFACTURING, INC.'S ANSWER TO AMENDED COMPLAINT (DOC. 9), AND COUNTERCLAIMS AGAINST PLAINTIFFS**

Comes now Defendant Precision Machine & Manufacturing, Inc. ("Precision" or "Defendant") and in answer to the Amended Complaint ("Complaint") (Doc. 9) of Plaintiffs Finn Corporation ("Finn") and Express Blower Inc. ("EB'), together referred to herein as "Plaintiffs," and alleges upon information and belief:

1. Defendant admits the allegations of ¶¶ 1-3 of the Complaint.

2. In response to ¶¶ 4-6 of the Complaint, Defendant admits that the Court is one of multiple courts which have subject matter jurisdiction over the Plaintiffs' claims in this case.

3. Defendant admits the allegations of ¶ 7 of the Complaint to the extent that it has contracted with Finn and EB, parties domiciled within the Court's judicial district. Defendant denies the remainder of the allegations of ¶ 7 of the Complaint.

4. Defendant admits the allegations of ¶ 8 of the Complaint to the extent that it has visited Plaintiffs' principal place of business within the Court's judicial district for business purposes but denies the remaining allegations of the paragraph, including the allegations that "a

1

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in and/or were directed at Plaintiffs located within this judicial district" and that venue is "proper" in this Court.

5. In response to ¶ 9 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

6. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of ¶¶ 10-12 of the Complaint and therefore denies such allegations and denies the portions of the paragraph that constitute argument.

7. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶ 13 of the Complaint and therefore denies such allegations

8. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶¶ 14-16 of the Complaint and therefore denies such allegations and denies the portions of the paragraph that constitute argument.

9. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶ 17 of the Complaint and therefore denies such allegations and denies the portions of the paragraph that constitute argument and/or expression of legal conclusions.

10. The allegations of ¶ 18 of the Complaint contain an image that speaks for itself. To the extent a response was intended to be elicited, Defendant denies the allegations.

11. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶ 19 of the Complaint and therefore denies such allegations.

12. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶ 20 of the Complaint and therefore denies such allegations and denies the portions of the paragraph that constitute argument and/or expression of legal conclusions.

13. The allegations of ¶ 21 of the Complaint contain an image that speaks for itself. To the extent a response was intended to be elicited, Defendant denies the allegations.

14. Defendant denies the allegations of ¶ 22 of the Complaint.

15. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶¶ 23-24 and therefore denies such allegations.

16. Defendant denies the allegations of ¶¶ 25-41 of the Complaint.

17. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶ 42 of the Complaint and therefore denies such allegations.

18. Defendant denies the allegations of ¶¶ 43 and 44 of the Complaint.

19. Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual allegations of ¶¶ 45-47 of the Complaint and therefore denies such allegations.

20. Defendant admits the allegations of ¶ 48 of the Complaint to the extent it supplied parts to Plaintiffs. Defendant denies the remaining allegations of ¶ 48 of the Complaint.

21. Defendant denies the allegations of ¶ 49 of the Complaint.

22. Defendant admits the allegations of ¶ 50 of the Complaint to the extent that Precision manufactured feeders used by Plaintiffs; Defendant denies the remaining allegations of ¶ 50 of the Complaint.

23. Defendant denies the allegations of ¶ 51 of the Complaint, further stating business dealings between Defendant and Plaintiffs as to the products at issue go back decades.

24. Defendant admits the allegations of ¶ 52 of the Complaint to the extent that Plaintiff's entered into an agreement titled "Memorandum of Understanding" ("MOU") stating the terms by which Defendant would design, manufacture and supply to Plaintiffs feeders for some of

3

Plaintiffs' products, but alleges that the MOU was entered into by the Plaintiffs on February 9, 2016.

25. The allegations of ¶¶ 53-57 of the Complaint reference a document which speaks for itself and contain an incomplete and therefore, inaccurate recitation of legal obligations. To the extent a response was intended to be elicited, Defendant denies them.

26. Defendant admits the allegations of ¶ 58 of the Complaint to the extent that the MOU was signed by Matt Day and by Kirk Morton and that Kirk Morton was then President of Precision Machine & Manufacturing. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations as to whether Matt Day was "Vice-President of Operations" for both Finn and EB and therefore denies such allegations.

27. Defendant admits the allegations of ¶ 59 of the Complaint to the extent that, on or about February 9, 2916, Matt Day signed a "Non-Disclosure/Confidentiality Agreement" ("2016 NDA") purportedly on behalf of Finn Corporation and that Kirk Morton signed such document on behalf of Defendant. The remaining allegations of ¶ 59 of the Complaint reference a document which speaks for itself and contain an incomplete and therefore, inaccurate recitation of legal obligations. To the extent a response was intended to be elicited, Defendant denies them.

28. The allegations of ¶ 60 of the Complaint reference a document which speaks for itself and contain an incomplete and therefore, inaccurate recitation of legal obligations. To the extent a response was intended to be elicited, Defendant denies them.

29. Defendant admits the allegations of ¶ 61 of the Complaint.

30. Defendant denies the allegations of ¶ 62 of the Complaint.

31. Defendant denies the allegations of ¶ 63 of the Complaint.

32.     Defendant denies the allegations of ¶ 64 of the Complaint, further stating that Defendant was the originator and supplier of specifications and drawings for the models identified in ¶ 64.

33.     Defendant denies the allegations of ¶ 65 of the Complaint.

34.     Defendant admits the allegations of ¶ 66 of the Complaint to the extent that Plaintiffs made purchases since the MOU's inception that qualified for the required minimum in certain years; Defendant denies the remaining allegations of ¶ 66 of the Complaint.

35.     Defendant admits the allegations of ¶ 67 of the Complaint to the extent it has been offering into the aftermarket parts and complete units for the airlocks only, and that in a single instance, Finn's name was used; Defendant denies the remaining allegations of ¶ 67 of the Complaint.

36.      Defendant admits the allegations of ¶ 68 of the Complaint to the extent that Exhibit 2 of the Complaint represented an accurate portrayal of content on Defendant's Facebook page for a brief period, but denies that such content currently exists on any of Defendant's social media sites. Defendant denies the remaining allegations of ¶ 68 of the Complaint.

37.     The allegations of ¶¶ 69 and 70 of the Complaint reference a document which speaks for itself. To the extent a response was intended to be elicited, Defendant denies them.

38.     Defendant denies the allegations of ¶ 71 of the Complaint.

39.     Defendant denies the allegations of ¶ 72 of the Complaint to the extent that it implies Finn and Express Blower had to give Defendant permission to sell blower truck parts or that the products were using Finn or Express Blower designs. Defendant denies the allegations of ¶ 72 of the Complaint to the extent they allege that Defendant used Express Blowers' name for the sale of replacement parts. Defendant denies the remaining allegations of ¶ 72 of the Complaint.

5

40.     Defendant denies the allegations of ¶¶ 73-75 of the Complaint.

41.     The allegations of ¶ 76 of the Complaint reference a writing that speaks for itself. To the extent a response was intended to be elicited, Defendant denies them.

42.     Defendant denies the allegations of ¶ 77 of the Complaint.

43.     In response to ¶ 78 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

44.     The allegations of ¶ 79 of the Complaint describe a legal conclusion to which no response is required. However, to the extent one was intended to be elicited, Defendant admits them.

45.     The allegations of ¶ 80 of the Complaint referencing the MOU as a legally enforceable agreement by Plaintiffs describe a legal conclusion to which no response is required. However, to the extent one was intended to be elicited, Defendant denies such conclusion. Defendant also denies the allegations of ¶ 80 that Finn and Express Blower have complied with their obligations of the MOU, that Defendant has breached any obligations, waived any rights, or that any of Defendant's rights are unenforceable.

46.     Defendant denies the allegations of ¶ 81 and specifically the allegations that Defendant's products are based on Finn and Express Blower's confidential information, processes, and designs, and that Finn or Express Blower made the minimum purchases required by the MOU.

47.     Defendant denies the allegations of ¶¶ 82-86 of the Complaint.

48.     In response to ¶ 87 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

6

49.     The allegations of ¶ 88 of the Complaint state legal conclusions to which no response is required. To the extent one was intended to be elicited, Defendant denies them.

50.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of ¶¶ 89 and 90 of the Complaint and therefore denies such allegations and denies the portions of the paragraphs that constitute argument or expresses a legal conclusion.

51.     Defendant denies the allegations of ¶¶ 91-95 of the Complaint.

52.     In response to ¶ 96 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

53.     Defendant denies the allegations of ¶¶ 97-99 of the Complaint.

54.     In response to ¶ 100 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

55.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of ¶¶ 101 of the Complaint and denies the portions of the paragraph that constitute argument or express  legal conclusions.

56.     Defendant denies the allegations of ¶¶ 102-111 of the Complaint.

57.     In response to ¶ 112 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

58.     Defendant denies the allegations of ¶¶ 113-119 of the Complaint.

59.     In response to ¶ 120 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

60.     Defendant denies the allegations of ¶¶ 121-124 of the Complaint.

61.     In response to ¶ 125 of the Complaint, Defendant admits, denies and alleges the incorporated allegations as if Defendant's admissions, denials and allegations were restated herein in full and verbatim.

62.     Defendant denies the allegations of ¶¶ 126-128 of the Complaint.

<u>**AFFIRMATIVE DEFENSES**</u>

Defendant raises each of the following affirmative defenses to each and every purported cause of action or claim asserted against it and to each of the acts and/or omissions with which Defendant is charged by the allegations of Plaintiffs' Complaint. Defendant hereby alleges the following affirmative defenses without assuming the burden of proof for such where the burden is not imposed by law upon Defendant.

**FIRST AFFIRMATIVE DEFENSE**
**(Failure to State a Cause of Action)**

63.     The Complaint, and each and every cause of action, fails to state facts sufficient to constitute a cause of action against Defendant.

**SECOND AFFIRMATIVE DEFENSE**
**(Lack of Causation)**

64.     The acts alleged to have been committed by Defendant were not, and are not, the cause in fact, proximate cause or legal cause of any damage or injury to Plaintiffs alleged in Plaintiffs' Complaint.  Any and all damage or injury sustained by Plaintiffs was proximately caused or legally caused by Plaintiffs' own acts, errors or omissions and/or those of other parties.

**THIRD AFFIRMATIVE DEFENSE**
**(Plaintiffs' Breach of Contract)**

8

65.     Plaintiffs are barred from enforcing any provision of the MOU due to Plaintiffs' individual or joint breach of the agreement.

### FOURTH AFFIRMATIVE DEFENSE
### (Failure of Consideration)

66.     Plaintiffs are barred from enforcing any provision of the MOU due to a failure of consideration.

### FIFTH AFFIRMATIVE DEFENSE
### (Failure of Condition Precedent)

67.     Plaintiffs are barred from enforcing any provision of the MOU due to a failure of a one or more condition(s) precedent.

### SIXTH AFFIRMATIVE DEFENSE
### (Lack of Enforceability of Certain Provisions)

68.     Plaintiffs are barred from enforcing the provision of the MOU purportedly restraining Defendant from selling its feeders to customers other than Plaintiffs in the so-called "aftermarket" due to Plaintiffs' failure to meet their obligations under the MOU, including, but not limited to, the failure to purchase the minimum number of Precision's feeders each year, the failure to maintain pricing commitments, the failure to make orders in the required lot sizes, the failure to license proprietary designs while using such intellectual property of Precision to manufacture and sell the Precision-designed feeder, the failure to protect the intellectual property of Defendant from falling into the hands of third parties, the failure to pay license fees or other compensation for using Defendant's designs and the failure to refrain from misappropriating and using the commercially valuable intellectual property of Defendant for Plaintiff's benefit and to the detriment of Defendant.

### SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Damage or Injury)

69.     Plaintiffs' claims against Defendant are barred due to the lack of any damage or injury to Plaintiffs as a result of the acts, errors or omissions of Defendant.

### EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

70.     Any and all injury or damage suffered by Plaintiffs was the proximate result of Plaintiffs' own acts, errors and/or omissions and/or due to Plaintiffs' failure to mitigate their damages.

### NINTH AFFIRMATIVE DEFENSE
### (Waiver or Estoppel)

71.     Plaintiffs' claims against Defendant are barred by the doctrines of waiver and/or estoppel

### TENTH AFFIRMATIVE DEFENSE
### (Wrongful Conduct)

72.     Plaintiffs' claims against Defendant are barred, in whole or in part, by the wrongful conduct of Plaintiffs and/or persons acting at the direction, or under the control, or in privity with, or in concert with, Plaintiffs.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

73.     Plaintiffs' claims against Defendant are barred by the doctrine of unclean hands.

### TWELFTH AFFIRMATIVE DEFENSE
### (No Duty or Breach of Duty)

74.     Plaintiffs' claims against Defendant are barred because Defendant has no legal duty to Plaintiffs which it could have breached and therefore Defendant has not beached any duty to Plaintiffs by its conduct.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Misrepresentations)

75.     Plaintiffs' claims against Defendant are barred, in whole or in part, due to the misrepresentations to Defendant made by Plaintiffs and/or by persons acting at the direction, or under the control of, or in privity with, or in concert with, Plaintiffs.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (Failure to Perform)

76.     Plaintiffs are foreclosed from obtaining any damages or other relief in connection with any alleged breach of the MOU due to Plaintiffs' failure to perform their obligations under the MOU and/or comply with the conditions of the MOU.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**Independent Development and Prior Ownership (Counts I, IV, V)**

77.    Precision independently possessed the engineering know-how, manufacturing expertise, and design capability to develop rotary airlock feeders before and independent of its relationship with Plaintiffs. The feeder products Precision manufactures and sells were developed using Precision's own intellectual property, general industry knowledge, and independent design efforts, and not through use of any alleged Plaintiffs' confidential information or trade secrets.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**Information Alleged Is Not a Trade Secret (Counts IV & V)**

78.    The alleged "Feeder Specs" do not qualify as trade secrets under the Defend Trade Secrets Act or the Ohio Uniform Trade Secrets Act because they reflect general functional requirements, performance parameters, and design constraints that are commonly known, readily ascertainable, or dictated by engineering necessity and industry standards, and therefore lack independent economic value from secrecy.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**No Misappropriation (Counts IV & V)**

79.    Precision did not acquire, disclose, or use any trade secret of Plaintiffs through improper means or in violation of any duty owed to Plaintiffs. Plaintiffs' allegations improperly conflate lawful independent development and general industry knowledge with misappropriation.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
**No Breach of the Memorandum of Understanding (Count I)**

80.    Precision did not breach the Memorandum of Understanding ("MOU"). The MOU does not prohibit Precision from manufacturing or selling independently designed aftermarket components, and Plaintiffs' interpretation impermissibly expands the MOU beyond its text and lawful scope.

**NINETEENTH AFFIRMATIVE DEFENSE**
**Unenforceable or Limited Contractual Restrictions (Count I)**

81.    To the extent the MOU is construed to restrict Precision's ability to manufacture or sell aftermarket parts or to use independently developed designs, such provisions constitute

11

unenforceable restraints of trade, lack sufficient consideration, or are otherwise invalid or limited under applicable law.

### TWENTIETH AFFIRMATIVE DEFENSE
### Nominative and Descriptive Fair Use (Counts II, III, VI, VII)

82. Any reference to Plaintiffs' product names or trademarks was limited to nominative or descriptive use necessary to identify compatibility or application and did not imply sponsorship, affiliation, or authorization by Plaintiffs.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
### No Likelihood of Confusion or Deception (Counts II, III, VI, VII)

83. Plaintiffs cannot establish a likelihood of confusion or deception. Precision does not represent its products as Plaintiffs' goods or as authorized, sponsored, or approved by Plaintiffs, and the nature of the products and the sophistication of purchasers preclude confusion as a matter of law.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
### Truthful Commercial Speech (Counts II, VI, VII)

84. Precision's marketing and promotional statements were truthful, accurate, and non-misleading and therefore do not violate the Lanham Act, Ohio Deceptive Trade Practices Act, or common-law unfair competition principles.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
### Estoppel

85. Plaintiffs, by their course of dealing and acceptance of Precision's performance over an extended period, are estopped from asserting the claims alleged in the Amended Complaint.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
### Unclean Hands

86. Plaintiffs' claims for equitable relief are barred by unclean hands, as Plaintiffs seek to misuse contract, trademark, and trade secret theories to foreclose lawful competition in the aftermarket for replacement parts.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE
### Public Policy / Aftermarket Competition

87. Plaintiffs' claims impermissibly seek to extend intellectual-property and contractual rights to monopolize aftermarket replacement parts, contrary to federal and Ohio public policy favoring competition and consumer choice.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
### Failure to Prove Damages

88. Plaintiffs cannot establish actual damages proximately caused by Precision alleged conduct. Any claimed losses are speculative, unrelated to Precision's actions, or offset by lawful competition.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### No Willfulness or Exceptional Case

89. Precision acted in good faith and without willfulness, malice, or intent to deceive. Plaintiffs are therefore not entitled to enhanced damages, punitive damages, or attorney's fees under federal or Ohio law.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### (Adequate Remedy at Law)

90. Plaintiffs' requests for temporary, preliminary and permanent injunctive relief must fail as a matter of law as Plaintiffs have an adequate remedy at law because Plaintiffs can show no likelihood of imminent injury or irreparable harm in that Defendant has eliminated any reference to Plaintiffs and/or their products from Defendant's social media sites and/or other advertising materials.

### TWENTY-NINTH AFFIRMATIVE DEFEENSE
### (Laches)

91. Plaintiffs' claims against Defendant are barred, in whole or in part, by the doctrine of laches.

### THIRTIETH AFFIRMATIVE DEFEENSE
### (Extinguishment of Obligations)

92. Plaintiffs' claims against Defendant are barred, in whole or in part, because Defendant has performed, satisfied and discharged any and all duties and obligations it may have owed to Plaintiffs.

13

### THIRTY-FIRST AFFIRMATIVE DEFEENSE
### (Setoff)

93.     Plaintiffs' claims for damages against Defendant are barred or reduced by a setoff in such amounts as may be proven at trial as a result of Defendant's rights to damages, indemnity, subrogation and/or contribution from Plaintiffs due to Plaintiff's misappropriation and use of Defendant's designs and other intellectual property without compensating Defendant for such use.

### THIRTY-SECOND AFFIRMATIVE DEFEENSE
### (Lack of Standing)

94.     Plaintiffs' claims for damages against Defendant are barred, in whole or in part, due to Plaintiffs' lack of capacity or standing to sue.

### THIRTY-THIRD AFFIRMATIVE DEFENSE
### (Fed. R. Civ. Proc. 8)

95.     Plaintiffs' claims against Defendants are barred, in whole or in part, pursuant to the affirmative defenses set forth in Rule 8 of the Federal Rules of Civil Procedure.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE
### (Lack of Capacity to Sue)

96.     According to the records of the Ohio Secretary of State, Express Blower, Inc. was dissolved as of December 31, 2025.

### THIRTY-FIFTH  AFFIRMATIVE DEFENSE
### (Reservation of Right to Raise Additional Affirmative Defenses)

97.     Defendant reserves the right to raise additional affirmative defenses if subsequent investigation and discovery reveal that such defenses are warranted.

## PRAYER

WHEREFORE, Defendant, having fully answered Plaintiffs' allegations in its Complaint, prays for judgment in Defendant's favor that Plaintiffs take nothing by reason of said complaint or any purported cause of action; that Defendant be awarded any and all appropriate fees, costs, disbursements and litigation expenses, including reasonable attorney fees; and that Defendant receive such other and further relief as the Court deems just and equitable.

## COUNTERCLAIMS OF DEFENDANT PRECISION AGAINST PLAINTIFFS FINN AND EB

Defendant/Counterclaim Plaintiff Precision Machine & Manufacturing, Inc. ("Precision" or "Counterclaim Plaintiff") for its Counterclaims against Finn Corporation ("Finn") and Express Blower Inc. ("EB") together referred to herein as "Counterclaim Defendants," states as follows:

1. Precision incorporates its denials, averments, and affirmative defenses in Paragraphs 1 – 97 above into this Paragraph.

## PARTIES

2. Counterclaim Plaintiff Precision is an Oregon corporation with a principal place of business in Oregon.

3. Counterclaim Defendant Finn is an Ohio corporation with a principal place of business in Ohio.

4. Counterclaim Defendant EB was an Ohio corporation with a principal place of business in Ohio. EB is wholly-owned by Finn.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over the claims in this case because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

6. Venue is proper in this Court (among others) because Finn and EB reside in Ohio, and some of the events giving rise to Finn and EB's Amended Complaint and Precision's Counterclaims occurred in Ohio.

## FACTS

7. Precision is an industry leader in the design, manufacture, and sales of industrial machinery, primarily heavy-duty rotary airlock feeders, rotary valve airlocks and screw conveyors as components for material handling systems. Precision's rotary airlock feeder is a unique product,

15

highly regarded in the industry, and particularly effective in blower truck and blower equipment applications.

8.       In 2015 and 2016, Finn and Precision discussed a potential arrangement by which Precision would design, manufacture and supply to Finn and Finn's wholly-owned subsidiary, EB, Precision's rotary airlock feeders ("feeders") to be installed by Finn and EB as a component part in some of their equipment. Precision proposed to design, build, and supply new generation feeders which would be superior to the feeders Finn and EB had been installing in their blowers and blower trucks in the past.

9.       The discussions resulted in a Memorandum of Understanding ("MOU") signed by Matt Day, the then Vice President of Operations for Finn and EB, and by Precision's former President, Kirk Morton, on or about February 9, 2016. A true and accurate copy of the signed MOU was filed under seal in this case on December 1, 2025 as document ECF No. 16, the precise terms of which will not be discussed here due to the MOU's confidentiality.

10.      After signing the MOU, Precision began to supply Finn and EB with rotary feeders for their blower trucks.

11.      At all times, Precision operated in good faith and complied with the provisions of the MOU.

12.      At its sole cost and risk and pursuant to the MOU, Precision customized its own previously-existing and proven feeder designs to serve as new and improved feeders for use as a component within Finn and EB's blower trucks and blower equipment. Precision developed, designed, manufactured, and sold to Finn its new 18x33 model to replace Finn's old "12-Series" model, Precision's new 16x25 which replaced Finn's old "5-Series" model, and Precision's new model "302" to replace Finn's old model called "BB302." Precision also developed and designed

16

what Precision designated as a 12x15 model feeder for a new material blower machine that Finn was developing. All the feeders bear Precision serial numbers and the drawings for all of the new feeders designed and engineered by Precision, including the new 302 rotary feeder, bear the Precision legend and insignia and are under Precision's exclusive ownership, possession and control.

13. However, at various points after the MOU was executed, Finn and EB failed to adhere to the minimum lot sizes commitment and the minimum annual purchase requirements contained in the MOU.

14. Once the "business relationship" established by the MOU ended due to failure of the conditions precedent concerning minimum lots sizes and minimum annual purchases, Finn and EB failed to license Precision's feeders as required by the MOU and, instead, undertook a scheme to use the designs and other proprietary information related to the feeders to evade licensing Precision's feeders from Precision or otherwise compensating Precision for the use of its designs and other proprietary information concerning Precision's airlock rotary feeders.

15. In particular, Finn requested that a third party, William W. Meyer and Sons, Inc. ("Meyer"), build Precision's 302 blower truck feeder for Finn. Meyer's principal, Charlie Meyer ("Mr. Meyer"), later informed Precision's President and CEO Don Lindsey ("Mr. Lindsey"), that Mr. Meyer had had no idea what a blower truck feeder was until Finn requested that Meyer produce one for Finn.

16. Mr. Meyer also informed Mr. Lindsey that he requested the 302 drawings, but Finn replied that they did not have any. Instead, Finn shipped one of Precision's 302 blower truck feeders and paid Meyer to reverse engineer it, develop a drawing package, and build a single feeder for Finn.

17

17.    Mr. Meyer admitted that Meyer did in fact, reverse engineer it, developed a drawing package, and manufactured a single 302 unit, as requested by Finn.

18.    Mr. Meyer also admitted that Meyer did quote Finn for production for the 302 blower truck feeders, but Finn responded that Meyer's price was 20% more than what Precision was then charging Finn and Finn did not place any orders with Meyer at that time.

19.    After conducting the reverse engineering for Finn and yet receiving no orders for the manufacturing and supply of the feeders to Finn, both Finn and EB's parent company, DHG, Inc. ("DHG"), and Meyer expressed an interest in purchasing Precision and executed non-disclosure agreements ("NDA's") promising to protect the confidentiality of, and to refrain from using or transmitting to any third party, any confidential information obtained by the purported prospective purchasers in the process of exploring the potential purchase of Precision. The confidential information was defined as including information regarding Precision's services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, compositions, inventions, discoveries, designs, sketches, drawings, [etc.] and Plaintiffs' financial data including "existing and potential customers, employees, vendors or suppliers."

20.    After executing the NDA's, both Meyer and Finn's parent, DHG, toured Precision facilities and received significant private information regarding Precision's operations, including price and cost information, supplier information, sales projections, and its specialized manufacturing methods used by Precision in manufacturing the blower truck feeders.

21.    In addition, Meyer and DHG (and therefore Finn and EB) obtained access to sales projections, the sourcing for raw materials, the manufacturing methods used to achieve its pricing, key customers, key suppliers (including a new technology innovation relating to surface treatment

of feeders), costing and margins, competitors, design and engineering information, and proprietary manufacturing methods.

22. Within a few months, Meyer had installed a similar robotic manufacturing cell to that used by Precision in manufacturing the rotary feeders and Finn (without complying with its obligations under the MOU or its parent's obligation under the NDA's regarding the ownership of intellectual property) had begun ordering the Precision-designed feeders from Meyer.[1]

23. Rather than comply with their obligations at termination of the MOU, including payment of license fees for use of the Precision-designed feeders, Finn and EB began making the allegations resulting in this litigation in May 2025.

**COUNT ONE**
**BREACH OF MEMORANDUM OF UNDERSTANDING**

24. Precision incorporates the preceding paragraphs as though fully set forth here.

25. Precision, Finn, and EB entered into the MOU (ECF No. 16) freely and without duress.

26. The MOU is a valid and binding contract between the parties.

27. Pursuant to the MOU, Finn and EB had minimum lot size and purchase requirements.

28. Finn and EB also covenanted that they would license Precision's designs, engineering and other aspects of Precision's IP and trade secrets from Precision if the business relationship established by and described in the MOU ever became unsatisfactory or terminated.

29. Precision complied with the provisions of the MOU.

---

[1] Litigation between Precision and DHG, Inc. is currently pending regarding these issues in *PMM Holdings, LLC and Precision Machine & Manufacturing, Inc. v. DHG, Inc.*, Case No. 2:25-cv-02005-CSK (E.D. Cal.).

30.     Finn and EB breached their contractual obligations in various ways, including but not limited to: (1) failing to adhere to the minimum lot size and purchase commitments contained in the MOU, (2) failing to license Precision's feeders, and (3) using Precision's designs and other proprietary information related to the feeders to evade licensing Precision's feeders from Precision or otherwise compensating Precision for the use of its designs and other proprietary information.

31.     As a direct and proximate result of Finn and EB's breach of MOU, Precision has been damaged in an amount in excess of $75,000.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT / IMPLIED-IN-FACT LICENSE**

32.     Precision incorporates the preceding paragraphs as though fully set forth here.

33.     Through the parties' course of dealing and performance under the MOU, Counterclaim Defendants understood and agreed that:

a.  Precision's feeder designs and engineering were proprietary;

b.  Any continued use following termination of the business relationship would require authorization and compensation.

34.     After termination of the MOU relationship, Counterclaim Defendants continued to use Precision's designs, specifications, and physical products without authorization.

35.     Counterclaim Defendants thereby breached the parties' implied-in-fact agreement and/or implied license obligations.

36.     Precision has been damaged in an amount in excess of $75,000.

**COUNT THREE**
**MISAPPROPRIATION OF PRECISION'S INTELLECTUAL PROPERTY AND TRADE SECRETS**

37.     Precision incorporates the preceding paragraphs as though fully set forth here.

38.     At all times relevant to the allegations of this Complaint, Precision was the owner

20

of certain trade secret information including designs and other proprietary information related to its rotary feeders.

39.     Precision's feeder designs, engineering drawings, manufacturing methods, cost information, supplier data, and robotic production processes constitute trade secrets under Ohio law because:

    a.   They derive independent economic value from not being generally known; and

    b.   They are subject to reasonable efforts to maintain their secrecy.

40.     Finn and EB improperly acquired, used, and disclosed to third parties not authorized to receive such information, Precision's trade secrets.

41.     Finn and EB:

    a.   Used Precision feeders to reverse engineer designs through Meyer;

    b.   Directed third parties to replicate Precision's feeder (including the "302" model); and

    c.   Used Precision's proprietary manufacturing and pricing information to compete.

42.     Finn and EB's conduct violated federal and state statutes including, but not limited to, the Defend Trade Secret Act of 2016 (18 U.S.C. § 1836), and the Ohio Uniform Trade Secrets Act (R.C. 1333.67(A)).

43.      As a direct and proximate result of Finn and EB's misappropriation of Precision's trade secrets, Precision has been damaged in an amount in excess of $75,000, is entitled to its actual damages, unjust enrichment damages, exemplary damages for willful and malicious misappropriation, and attorney's fees.

**COUNT FOUR**
**DECEPTIVE TRADE PRACTICES**

44.     Precision incorporates the preceding paragraphs as though fully set forth here.

21

45. Pursuant to R.C. 4165.03(A)(2), "[a] person who is injured by a person who commits a deceptive trade practice that is listed in division (A) of section 4165.02 of the Revised Code may commence a civil action to recover actual damages from the person who commits the deceptive trade practice."

46. Precision is a "person" as defined in R.C. 4165.01.

47. Finn and EB engaged in deceptive trade practices in connection their sale of Precision's airlock rotary feeders when:

    a. Finn and EB caused likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, in violation of R.C. 4165.02(A)(2); and

    b. Finn and EB caused likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another, in violation of R.C. 4165.02(A)(3).

48. As a direct and proximate result of Finn and EB's violations of R.C. 4165.02, Precision has been damaged in an amount in excess of $75,000.

## COUNT FIVE
## FRAUDULENT MISREPRESENTATION

49. Precision incorporates the preceding paragraphs as though fully set forth here.

50. In the MOU executed between the parties, Finn and EB represented that they would license Precision's designs, engineering and other aspects of Precision's IP and trade secrets from Precision if the business relationship established by and described in the MOU ever became unsatisfactory or terminated.

51. Finn and EB never licensed Precision's designs, engineering and/or other aspects of Precision's IP and trade secrets once the MOU was terminated.

22

52.     Finn and EB had no intention of ever licensing Precision's designs, engineering and/or other aspects of Precision's IP and trade secrets. Instead, they intended to obtain access to Plaintiffs' trade secrets and have Precision design, engineer and develop next-generation airlock rotary feeders customized for use in Finn's and EB's products as a step in a scheme to obtain control and use of such designs, intellectual property, and trade secrets without having to pay Precision for such control and use.

53.     Finn and EB intended for Precision to rely on Finn and EB's misrepresentations such that Precision would execute the MOU and provide Finn and EB with Precision's trade secrets.

54.     Precision reasonably relied on the misrepresentations of Finn and EB and was induced to provide access to such commercially valuable proprietary information.  Precision's reliance was justified as they had no reason to suspect, and did not suspect, that Finn's and EB's representations were false or what Finn's and EB's actual goal was in obtaining Precision's trade secrets. Finn and EB, on the other hand, knew their true intentions, and knew the representations were false when they were made.

55.     As a direct and proximate result of Finn and EB's fraudulent misrepresentations, Precision has been damaged in an amount in excess of $75,000.

**COUNT SIX**
**UNJUST ENRICHMENT**

56.     Precision incorporates the preceding paragraphs as though fully set forth here.

57.     Finn and EB knowingly received benefits from Precision, including proprietary feeder designs, engineering and manufacturing know-how and competitive pricing structures and methods.

58.     Finn and EB retained and exploited these benefits without paying compensation.

23

59.     It would be unjust for Finn and EB to retain these benefits without payment.

## COUNT SEVEN
## CONVERSION

60.     Precision incorporates the preceding paragraphs as though fully set forth here.

61.     Precision owns proprietary tangible and intangible property, including feeder units, drawings, design packages, and trade secret information.

62.     Finn and EB wrongfully exercised dominion and control over this property, including by reverse engineering and exploiting it for their own use.

63.     Precision has been damaged in an amount in excess of $75,000.00.

## COUNT EIGHT
## UNFAIR COMPETITION

64.     Precision incorporates the preceding paragraphs as though fully set forth here.

65.     Under Ohio common law, unfair competition includes conduct that is contrary to honest commercial practices, including the wrongful use of another's proprietary information, business methods, or product configurations to gain a competitive advantage.

66.     Precision invested substantial time, effort, and resources to develop: proprietary feeder designs and configurations, engineering drawings and specifications, manufacturing methods (including specialized robotic processes), pricing models and cost structures; and business strategies for supplying feeder components for blower equipment.

67.     Finn and EB obtained access to this information through their contractual and business relationship with Precision and through confidentiality obligations governing that relationship.

68.     Rather than compete fairly in the marketplace, Finn and EB engaged in a course of unfair and deceptive conduct, including:

a. Using Precision's proprietary feeder designs and physical products to facilitate reverse engineering by a third party;

b. Misusing confidential technical, manufacturing, and pricing information to replicate Precision's products and processes;

c. Coordinating with Meyer to develop substitute feeders derived from Precision's proprietary work; and

d. Structuring their conduct to avoid paying for licenses or otherwise compensating Precision.

69. Finn and EB's conduct was undertaken intentionally, in bad faith, and with the purpose of appropriating Precision's competitive advantages and displacing Precision as a supplier in the relevant market.

70. As a direct and proximate result of this unfair competition, Precision has suffered damages, including lost sales, lost business opportunities, and loss of goodwill.

71. Precision is entitled to recover compensatory damages and such other relief as the Court deems appropriate, including injunctive relief to prevent further unfair competition.

## COUNT NINE
## DECLARATORY JUDGMENT

72. Precision incorporates the preceding paragraphs as though fully set forth here.

73. An actual controversy exists regarding:

a. The ownership of feeder designs and engineering;

b. The legality of Finn and EB's use of such designs; and

c. Whether a license or compensation is required.

74. Pursuant to 28 U.S.C. § 2201 and Ohio Revised Code Chapter 2721, Precision seeks a declaration that:

     a.   Precision owns the feeder designs and related intellectual property;

     b.   Finn and EB's use without authorization is unlawful; and

     c.   Finn and EB must cease use or pay appropriate licensing fees.

75.     Speedy relief is necessary to preserve Precision's rights.

## PRAYER FOR RELIEF

WHEREFORE, Precision respectfully requests that this Court:

A) Find in favor of Precision;

B) Declare that:

     a.   Precision owns the feeder designs and related intellectual property;

     b.   Finn and EB's use without authorization is unlawful; and

     c.   Finn and EB must cease use or pay appropriate licensing fees.

C) Award Precision compensatory damages in an amount to be determined at trial in excess of $75,000.00;

D) Award Precision disgorgement or restitution by Counterclaim Defendants of any and all benefit obtained by them from their wrongful conduct;

E) Enjoin Counterclaim Defendants from use of Precision's protected trade secrets and other intellectual property;

F) Award interest, costs, and attorney's fees as permitted by law; and

G) Provide all such other relief that this Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Precision hereby respectfully demands a trial by jury in this matter.

Respectfully submitted,

*/s/ Terry W. Posey, Jr.*

26

Terry W. Posey, Jr. (0078292)
Trial Attorney
PORTER WRIGHT MORRIS & ARTHUR LLP
1 South Main Street, Suite 1600
Dayton, Ohio 45402-2028
Telephone: (937) 449-6709
Facsimile: (937) 449-6820
tposey@porterwright.com

Margo S. Brandenburg (101183)
PORTER WRIGHT MORRIS & ARTHUR LLP
250 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone: (513) 369-4223
Facsimile: (513) 421-0991
mbrandenburg@porterwright.com

*Attorneys for Defendant Precision Machine &
Manufacturing, Inc.*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2026 I electronically filed the foregoing with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Terry W. Posey, Jr.*
Terry W. Posey, Jr. (0078292)

27622737.6