**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| FINN CORPORATION, *et al.*, | : | Case No. 1:25-cv-00418-JPH |
| | : | |
| Plaintiffs, | : | Judge Jeffery P. Hopkins |
| | : | |
| v. | : | Magistrate Judge Stephanie K. Bowman |
| | : | |
| PRECISION MACHINE & MANUFACTURING, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFFS FINN CORPORATION AND EXPRESS BLOWER INC.'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS DEFENDANT PRECISION MACHINE AND MANUFACTURING, INC.'S COUNTERCLAIMS**

## I. INTRODUCTION

Defendant Precision Machine and Manufacturing, Inc.'s ("Precision") Opposition (Doc. 26) (the "Opposition") to Plaintiffs' Motion to Dismiss (Doc. 25) (the "Motion") erroneously projects Precision's own shortcomings on Plaintiffs and mischaracterizes Plaintiffs' actual grounds to dismiss Precision's counterclaims. The Motion attacks the Counterclaims (Doc. 19) on what those Counterclaims allege, in light of the Parties' contract, the Memorandum of Understanding (Doc. 15-1) ("MOU"), actually states. And while Precision attempts to brush aside the Motion as Plaintiffs' characterizations of the Counterclaims and the MOU, it is Precision that ignores what the MOU actually says and fails to understand why its own statements of its counterclaims—even assuming all facts to be true—remain defective. Precision's arguments fail to rescue its pleading from the defects the Motion raises, and the Court should dismiss all nine counterclaims.

## II. ARGUMENT

### A. Precision Fails to State a Claim for Breach of the MOU (Count One).

Precision's breach of contract claim fails because the facts it alleges—even if true—do not

constitute any breach of the MOU's actual provisions. *See* Mot. at PAGEID ## 211–15. Precision's Opposition consistently attempts to use its own allegations as to what the MOU requires, rather than the actual language of the MOU. That tactic fails because the MOU's actual, express terms are written and of record in this case. *See* Doc. 15-1.[1] "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations," and the Court accepts facts stated in the document itself. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012); *Chapter v. Martinez*, 248 F. Supp. 2d 679, 681 (S.D. Ohio 2002). Precision's allegations about the MOU's provisions cannot change what those provisions actually state, and as the MOU's text trumps those allegations, Precision's claims fail.

*i.* *The MOU's terms regarding "minimum lot size[s]" and "minimum annual purchases" are not ambiguous and do not require Plaintiffs to purchase any number of feeders from Precision.*

Plaintiffs' "failure" to purchase any number of feeders cannot constitute a breach of the MOU. *See* Mot. at PAGEID ## 211–213. The MOU uses the terms "minimum lot size[s]" and "minimum annual purchases," but it does not obligate Plaintiffs to purchase any volume of feeders, such that not doing so would precipitate a breach of contract. *See id*. Confronted with that reality, Precision declares these terms ambiguous, arguing that they are somehow "susceptible to more than one meaning." *See* Opp. at PAGEID ## 235–37. But beyond that naked declaration, Precision does not explain why or how that is the case.

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement

[1] This Reply will cite to the MOU in the same manner as the Motion, which cites to the complete, under-seal version of the MOU. *See* Mot. at PAGEID # 208, n. 1. A public version is also of record on the Docket. *See* Docs. 24-2.

or where the language is susceptible of two or more reasonable interpretations." *Id*. at 763 (citations omitted). "***A contractual term is not ambiguous merely because two parties offer substantially different interpretations.***" *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (emphasis added). "[A] contract is unambiguous if it can be given a definite legal meaning." *LM Ins. Corp. v. Criss*, 716 F. App'x 530, 533 (6th Cir. 2017) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). The court should not create ambiguity where none exists. *GGS Info. Sys. v. HDT Expeditionary Sys.*, No. 1:20CV305, 2021 U.S. Dist. LEXIS 12812, *8 (Jan. 25, 2021) (collecting cases).

While the MOU refers to "minimum lot size[s]" and "minimum annual purchases," those terms do not obligate Plaintiffs to purchase any volume of feeders or otherwise provide that not purchasing any amount would constitute a breach. *See* Mot. at PAGEID # 212–13 (citing MOU, p. 3, p. 4). Yet Precision persists, arguing that those terms somehow "established commitments Plaintiffs undertook." Opp. at PAGEID # 235. Precision does not identify what terms from the MOU support that notion or make its interpretation reasonable. Instead, it relies only on its own allegations about what the MOU says—ignoring what the MOU actually says—to create a supposed conflict as to what the MOU means and declare the MOU ambiguous. *See id*. (citing only Countercl., ¶ 13, ¶ 27, ¶ 30).

Precision cannot create ambiguity by asserting a friendlier interpretation that is completely detached from the MOU's terms. Rather, the Court must review what the MOU actually states. *See GGS Info. Sys.*, 2021 U.S. Dist. LEXIS 12812, *10–13 (interpreting the meaning certain terms based on the express language of the contract); *Cafaro Bradford Tuller Square, LLC. v. PetSmart, Inc.*, 2012 U.S. Dist. LEXIS 93445, at *13-15 (same). The Motion explains the meaning and import of "minimum lot size" and "minimum annual purchases," as the MOU uses those terms,

including the MOU's provisions as to what happens if Plaintiffs' orders do not comport with "minimum lot size" and "minimum annual purchase" amounts—none of which is a breach of a non-existent obligation to buy any number of feeders. *See* Mot. at PAGEID ## 211–213. Precision cannot add non-existent obligations to the MOU with its own allegations about what the MOU means, particularly where that self-serving interpretation contradicts what the MOU actually says.

Accordingly, the MOU provides the obligations of the Parties, which do not include any requirement for Plaintiffs to purchase any number of feeders from Precision. Precision's breach claim based on that imagined obligation fails for that simple reason and cannot be fixed with further amendment to the claim.

*ii.* *Precision effectively abandons any contention that a failure to take a license is a breach of the MOU's actual terms.*

As to licensing, the MOU expressly states that "***Precision*** agrees that it will license its designs for rotary feeders to FINN and EB ***on the basis of terms to be negotiated later***." *See* Motion at PAGEID ## 213-14 (quoting MOU, p. 4 (emphasis added)). Therefore, the MOU imposes no licensing obligation on Plaintiffs. Instead, it only requires ***Precision*** to license its "designs for rotary feeders" to Plaintiffs, on "terms to be negotiated later." *Id*. Precision makes no effort to oppose this basic reading of the MOU's plain language and indeed agreed that Precision is the obligor in its Opposition to Plaintiffs' Motion for Preliminary Injunction. *See* Doc. 27 at PAGEID # 264. Therefore, Precision's factual allegations that Plaintiffs did not take a license do not possibly ground a breach of the MOU. No amendment to Precision's counterclaims can change the MOU's provisions, and, therefore, any amendment would be futile.[2]

[2] Mixing this argument with its argument regarding confidential information, Precision appears to state that its breach of a supposed licensing requirement depends on "what Plaintiffs did with Precision's information." *See* Opp. at PAGEID # 237. But Precision fails to explain how, and whatever Plaintiffs may have done with any information does not create any obligations the MOU did not impose on Plaintiffs, so any such facts are irrelevant.

*iii.* *<u>Precision does not state a breach claim related to use of any information.</u>*

As the Motion explains, and Precision conveniently ignores, the MOU specifies that the Parties "agree to protect the confidentiality of the designs, the pricing, volumes, and any other information about their business relationship ***with the same care that they safeguard other information about their respective businesses***." Mot. at PAGEID # 215 (citing MOU, p. 4 (emphasis added)). Precision responds only by arguing that Paragraphs 14–22 of the Counterclaims state "how Plaintiffs obtained, transferred, and exploited Precision's protected information," to try to relegate the issue to a factual dispute. *See* Opp. at PAGEID # 237.

But Precision's attempt fails because it ignores what its own allegations actually say—none of which plausibly show that Plaintiffs did anything that offend the actual provisions of the MOU. Indeed, other than a conclusory statement that Plaintiffs "undertook a scheme to use" Precision's information in Paragraph 14, Paragraphs 14–22 of the Counterclaims only allege acquisition of information, not disclosure or use, particularly any use attributable to Plaintiffs. *See* Countercl., ¶¶ 14–22. The MOU does not purport to restrict the acquisition of any information in any way, so Plaintiffs acquiring any information cannot be a breach. *See* MOU, p. 4 (quoted above). And, to the extent that Precision means to say that Plaintiffs ordering feeders from Meyer was an unauthorized use of any information, that allegation also fails to plausibly state a breach of the MOU because it does not make the conclusion that Plaintiffs failed to protect any information "with the same care that they safeguard other information about their respective businesses" plausible. *See* MOU, p. 4. Plaintiffs needed feeders to carry on their business and, axiomatically, use their own information to carry on their business. The allegation that they used Precision information to carry on their business not only fails to plausibly show, but rebuts, any conclusion that Plaintiffs breached their obligation to protect Precision's information like it protects its own.

Thus, the Court should dismiss Precision's breach of contract claim in its entirety.

**B. Precision Fails to State a Claim for Breach of an Implied Contract (Count Two).**

Precision's implied contract claim fails as a matter of law, even if, as Precision now asserts, Precision pleads it in the alternative. *See* Opp. at PAGEID ## 238–39. As a matter of law, Precision cannot claim an implied contract obligating Plaintiffs to take a license where an express contract, the MOU, exists and expressly dispels that any such implied agreement existed. Mot. at PAGEID # 216; MOU, p. 4 (stating that any license would be on terms "to be negotiated later").

Precision argues that "Plaintiffs cannot have it both ways, arguing under Count One that the MOU does not require a license while arguing under Count Two that the MOU forecloses any implied licensing obligation covering the same gap." *See* Opp. at PAGEID #239. But the MOU's language allows those positions to coexist because it specifically does cover the subject matter of licensing—by expressly disclaiming that any agreement as to a license exists, and that, instead, "***Precision agrees*** that it will license its designs for rotary feeders to FINN and EB on the basis of ***terms to be negotiated later***." MOU, p. 4 (emphasis added).

Accordingly, the MOU's express language forecloses Precision's implied contract claim—even when plead in the alternative—as it governs the asserted basis for that claim. *See Colley v. P&G*, No. 1:16-cv-918, 2016 U.S. Dist. LEXIS 137725, *42-43 (S.D. Ohio Oct. 4, 2016) (citing *Amarado Oil Co. v. Davis*, No. 5:12-cv-627, 2013 U.S. Dist. LEXIS 133571, at *31-35 (N.D. Ohio Sept. 17, 2013)). The Court should dismiss this claim with prejudice, as no amendment can rewrite the MOU so as to leave room for an implied contract.[3]

**C. Precision Fails to State a Claim for Trade Secret Misappropriation (Count Three).**

Precision fails to state a trade secret claim because it fails to sufficiently identify any supposed trade secret, plead facts that plausibly show any supposed trade secret is protectable, or

[3] And, as noted in the Motion, Precision further fails to plead this claim because the Counterclaims lack any facts that could plausibly show an implied contract existed. *See* Mot. at PAGEID #216, n. 7; *see also generally*, Countercl.

plausibly plead misappropriation. *See* Mot. at PAGEID ## 216–22. As discussed below, nothing in Precision's Opposition fixes or avoids those defects. *See* Opp. at PAGEID ## 239–43.

*i. Precision never sufficiently identifies any supposed trade secret.*

As the Motion explains, Precision's pleading of its trade secrets falls short of sufficiently identifying any supposed trade secrets because the Counterclaims merely provide a list of general categories of information and data, without any detail sufficient to separate any trade secret from general or specialized trade knowledge. *See* Mot. at PAGEID ## 217–18. Precision opposes by pointing to particular paragraphs of its Counterclaims, asserting that those paragraphs list "specific, bounded categories tied to specific products," by "naming the precise models at issue, the specific manufacturing process, and discrete technological innovation." *See* Opp. at PAGEID # 240 (citing Countercl., ¶ 12, ¶¶ 19–21, ¶ 39). But beyond that conclusory characterization, Precision does not, and cannot, point to allegations in its Counterclaims that provide any further detail as to what these nebulous categories of information include—let alone in a way that separates them from general or specialized knowledge in the trade; or in a way that allows the Court to apply the criteria for trade secret protection—so as to make its identification sufficient. *See* Mot. at PAGEID # 217–18 (stating identification standard). And while Precision restates a list of terms from the Counterclaims, each item in that list remains insufficient. Specifically:

**"Precision's specialized robotic manufacturing cell and methods":** Precision never explains, even in general terms, what makes its robotic manufacturing cell "specialized," or what "methods" are supposedly trade secrets. *See* Opp. at PAGEID # 240; Countercl., ¶ 39. The only discernable point is that Precision somehow uses robots in manufacturing in some unspecified way—indistinct from manufacturers of all sizes in almost every industry on the planet. This falls well short of any information that could plausibly reach beyond general knowledge into trade secrecy, and the pleading is insufficient. *See A.B. Pratt & Co. v. Bridgeport Grp., LLC*, No. 1:22-

CV-1579-PAB, 2023 U.S. Dist. LEXIS 62708, at *81 (N.D. Ohio Apr. 10, 2023).

**"[A] 'new technology innovation relating to surface treatment of feeders'":** Precision misreads its own Counterclaims, which do not list a surface treatment as a trade secret at all. *See* Opp. at PAGEID # 240. Rather, the Counterclaims list unspecified "key suppliers" as a supposed trade secret, referencing surface treatment in a modifying parenthetical. *See* Countercl., ¶ 21 ("key suppliers (***including*** a new technology innovation relating to surface treatment of feeders)" (emphasis added)). And, in any event, Precision never identifies what "surface treatment" means or what it applies to, beyond an unspecified reference to "feeders." *See generally,* Countercl. So not only does Precision's Opposition fail to rehabilitate its pleading, it also further obscures what Precision itself believes is a trade secret.

**"Precision's cost structures, margins, sourcing, and supplier data":** These items are nothing more than "general categories of information and data" insufficient to plead a trade secret. *A.B. Pratt & Co.*, 2023 U.S. Dist. LEXIS 62708, at *81-82. While Precision need not state its particular data, it must identify supposed trade secrets to a degree sufficient to apply the standards for protection. Structures as to what costs? Which margins? Sourcing of what? What data about suppliers? None of that information is the supposedly underlying trade secret data, but Precision never answers anyway, so the list items remain insufficient, "nebulous" categories.

**"[E]ngineering and design packages for named feeder models":** Precision asserts that it has sufficiently identified trade secrets related to feeder "designs" because it has identified particular feeder models. *See* Opp. at PAGEID # 240.[4] But listing particular models does nothing to explain what "design" of any of those products means or otherwise identify what information Precision means to assert. Nor does it separate any such information from general or specialized

[4] Precision never defines, either in the Counterclaims or its Opposition, "design packages," or otherwise explains what a "design package" may include, even in general terms. *See generally, id.*; Countercl..

knowledge in the trade that could make Precision's pleading sufficient. Listing a model may specify a product, but it does not inform what about that product may be a trade secret. Precision's identification is "both too vague and too inclusive[] and does not allow a jury to separate the trade secrets from the other information that goes into any product in the field." *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) (internal quotations omitted). Therefore, the pleading remains defective. *See Pritchard v. Thompson*, No. 22-cv-2838-JPM-tmp, 2023 U.S. Dist. LEXIS 158255, at *23-24 (W.D. Tenn. Aug. 3, 2023) (dismissing where plaintiff alleged trade secrets related to a "very specific proprietary design" of a particular prototype but failed to further identify the protectable aspects of the design at issue.), *adopted by* 2023 U.S. Dist. LEXIS 157637 (W.D. Tenn. Sep. 6, 2023).

Moreover, that the Counterclaims' do not state what "designs" means or what information it might entail presents a deeper problem for Precision, given that the feeders have been sold to the public. *See* Mot. at PAGEID ## 219–20. Precision never species what about their "designs" are supposedly trade secrets, but because the product is publicly sold, those trade secrets cannot possibly be as broad as the word "designs," unexplained, would implicate. And while Precision responds by arguing that public sale may not disclose particular types of information, the Counterclaims do not attempt to specify something narrower as a trade secret. *See* Opp. at PAGEID # 241; *but see* Compl., ¶ 12, ¶ 14, ¶ 21, ¶ 39. In other words, the issue is not that nothing related to any designs could be a trade secret—it is that any trade secret that could exist cannot possibly be as broad as Precision asserts, as the feeders themselves, and whatever can be ascertained about their design from them, is public. *See also* Mot. at PAGEID ## 219–20; *Sunjoy Indus. Grp., Ltd. v. Permasteel, Inc.*, No. 2:22-cv-1896, 2023 U.S. Dist. LEXIS 13257, at *24 (S.D. Ohio Jan. 25, 2023) ("[I]nformation disclosed by a marketed product cannot be secret.").

Because Precision fails to sufficiently identify any supposed trade secret, it fails to state a claim for that reason alone and further obscures Precision's insufficient pleading of the other required elements of a trade secret claim.

*ii.* *Precision fails to plead independent economic value and reasonable measures to maintain secrecy.*

Precision's trade secret claim also fails because Precision fails to plausibly plead that any supposed trade secret is protectable, *i.e.* (1) that it derives independent economic value from not being generally known and (2) that Precision took reasonable measures to maintain the secrecy of that information. *See Mot*. at PAGEID ## 218–19. In fact, even in opposition, ***Precision makes no attempt to argue it pled independent economic value.*** *See* Opp. at PAGEID ## 240–41. The Counterclaims include only a threadbare recitation of this element, and the trade secret claim fails for this reason alone. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

As for reasonable measures to maintain the secrecy of any trade secrets, Precision now points to the "NDAs" that "Plaintiffs and their parent signed before touring Precision's facilities." *See* Opp. at PAGEID ## 240–41 (citing Countercl. ¶¶ 19–21, ¶ 39). The Counterclaims themselves never identify these agreements as Precision's supposedly reasonable measures. But in any event, the pleading fails, at least as to any information Plaintiffs may have obtained before those NDAs were executed, for the simple reason that the NDAs could not protect information disclosed before they existed.[5] By Precision's own pleading, that includes at least Precision's "designs and other proprietary information related to the feeders." *See* Countercl., ¶¶ 12–21 (alleging Plaintiffs possessed that information before the Parties' "business relationship" ended, and that the NDAs occurred only after Plaintiffs later directed reverse engineering of the feeders).

Accordingly, Precision makes no attempt to plausibly plead or explain independent

[5] Moreover, Precision does not allege that Plaintiffs were party to these NDAs. *See* Countercl., ¶ 19. Nor were they.

economic value, and its position as to reasonable measures is defective, simply as a matter of timing. Its trade secret claim fails for each of these reasons alone.

*iii.* *<u>Precision's misappropriation allegations remain lacking.</u>*

Precision's trade secret claim fails to plausibly plead misappropriation. The Counterclaims allege misappropriation through allegations that Plaintiffs reverse engineered a feeder and used other "proprietary information to compete." *See* Countercl., ¶ 41. But because reverse engineering is not misappropriation, and because Precision only alleges that DHG, not Plaintiffs, acquired the other "proprietary information," the pleading fails. *See* Mot. at PAGEID ## 221–22.

Precision responds with a new theory: that Plaintiffs' alleged reverse engineering was improper because it was somehow based on a "breach of a confidential relationship." *See* Opp. at PAGEID ## 241–42. But Precision never explains the "confidential relationship" it now, for the first time in its Opposition, relies upon. *See id*. Rather, it only cites to its allegations regarding the act of reverse engineering, starkly devoid of any discussion of a supposed "confidential relationship." *See id*. (citing Countercl., ¶¶ 15–18). Precision does not attempt to explain how Plaintiffs giving a feeder, readily purchasable in the open market and that they themselves purchased, to a third party breaches any confidentiality obligation. Nor do those alleged acts offend any obligation Plaintiffs had under the MOU, the only governing document at the time. *See also* Section II.A.iii, *supra*; *see generally* MOU (no restriction on reverse engineering). In fact, Precision itself alleges Plaintiffs directed the reverse engineering only for use in their business and do not explain how doing so would constitute a use of information in a manner Plaintiffs would not use their own information. *See* Section II.A.iii, *supra*. So even if Precision could now pivot to a breach of a confidential relationship to rescue its claim, it fails to articulate how reverse engineering breached any such relationship. Any discussion of "fair and honest means" need go

no further.[6]

Precision's attempt to rehabilitate its insufficient allegations related to information given to DHG are similarly unavailing. *See* Opp. at PAGEID ## 242–43. Precision's pleading is defective because it merely assumes that Plaintiffs obtained information given to DHG by sole virtue of Precision giving DHG access to such information. *See* Mot. at PAGEID # 221 (discussing Countercl., ¶ 21). Precision never alleges that DHG disclosed anything to Plaintiffs, or that Plaintiffs themselves used any information DHG had access to. It instead merely assumes Plaintiffs obtained the information by the act of DHG accessing that information—facts that, even if they somehow could be true, would not be misappropriation because Precision itself gave DHG that information. *See* Countercl., ¶ 21. Precision only otherwise asserts that it alleged that DHG is Plaintiffs' parent, and that Plaintiffs—not DHG—directed the reverse engineering and obtained its results. *See* Opp. at PAGEID # 243. So while Precision may assert in its Opposition that the reverse engineering was somehow "tainted" by some sort of confidentiality breach, it never connects reverse engineering to any other information that it would have depended upon. This gap is not "the stuff of discovery," but the stuff of plausible pleading, properly tested on a motion to dismiss. *Compare id*.

Accordingly, Precision's trade secret claim remains defective because it fails to sufficiently plead any of the requirements for establishing a trade secret or misappropriation—each of which is independent grounds for dismissal.

### D. Precision Fails to State a Claim for Deceptive Trade Practices (Count Four).

Precision fails to state a deceptive trade practices claim because it alleges no facts that

[6] Precision also references its other supposed trade secrets in this discussion but does not otherwise connect them to the allegations of reverse engineering or otherwise explain how they aided the acquisition or use of any information reverse engineering may have yielded, making Precision's point a non sequitur. *See* Opp. at PAGEID # 242.

could possibly show such a claim. No allegations of any representation to the market. No allegations as to any likelihood of confusion. Nothing. *See* Mot. at PAGEID # 222.

Precision opposes only by asserting that it alleged "that Plaintiffs passed off feeders derived from Precision's designs as their own product line." *See* Opp. at PAGEID # 243 (citing Countercl., ¶¶ 12–22). But none of the allegations Precision cites, or any other allegations, assert anything of the kind—not even the claim itself. *See* Countercl., ¶¶ 44–48. Accordingly, this claim is the very definition of a "threadbare recitation of the elements" insufficient to state a claim. *See Twombly*, 550 U.S. at 555. The Court should dismiss for that simple reason.[7]

### E. Precision's Claims for Fraudulent Misrepresentation, Unjust Enrichment, Conversion, and Unfair Competition are Legally Barred and/or Irreconcilably Defective (Counts Five, Six, Seven, and Eight).

#### *i. Precision's claims are preempted by the Ohio Uniform Trade Secrets Act (OUTSA).*

Precision's Counts Five through Eight are preempted by the OUTSA because they depend on the same operative facts as Precision's trade secret claim and implicate the field governed by the OUTSA. *See* Mot. at PAGEID ## 223–25. While Precision attempts to evade preemption by distinguishing its claims, those attempts fail. *See* Opp. at PAGEID ## 244–46.

Precision first argues that finding preemption is premature because each of its claims "rest in part on information that may or may not ultimately qualify as a trade secret." *See id.* at PAGEID # 244. In fact, as to its unjust enrichment and unfair competition claims, Precision does not try to distinguish those claims from the same basis as its trade secret claims—it only tries to rescue those claims by labeling them "alternative theories" "should the information at issue be found not to constitute a trade secret." *Id*. at PAGEID # 245.[8]

[7] As if acutely aware of this issue, Precision insists it should be allowed leave to amend its Counterclaims to support this claim. *See* Opp. at PAGEID # 243. While Plaintiffs cannot imagine how Precision could adequately plead such a claim, futility of amendment is not facially apparent, unlike the counterclaims Plaintiffs seek to dismiss with prejudice.
[8] The Counterclaims never state that Precision asserts these or any other claims in the alternative.

But alternative pleading does not save these claims from preemption because "the OUTSA preempts causes of action based on allegations related to confidential information, ***even if that information is ultimately not deemed a trade secret.***" *Ecolab, Inc. v. Glanz*, No. 1:22-cv-197, 2023 U.S. Dist. LEXIS 52997, at *13 (S.D. Ohio Mar. 27, 2023) (emphasis added); *Hanneman Family Funeral Home & Crematorium v. Orians*, 235 N.E.3d 361, 367, ¶ 21 (Ohio 2023) (that information may "not ultimately found to be a trade secret[] under the [OUTSA does] not make the preemption clause inapplicable." (cleaned up)); *Am. Consol. Indus., Inc. v. Blasingim*, No. 1:19-cv-00137, 2025 LX 645209, at *101 (N.D. Ohio Sep. 30, 2025); *see also Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 732 (N.D. Ohio 1999) ("Should plaintiff fail to establish that it does own protectable trade secrets, [] it cannot fall back on a general theory of unfair competition."). Precision's claims are based on allegations that Plaintiffs took and misused confidential information. *See* Mot. at PAGEID # 224 (citing Countercl., ¶¶ 50–51, ¶ 57, ¶ 61, ¶ 66). That in itself settles the preemption question.

Precision's other attempts to distinguish its tort claims to avoid preemption do not change that result. Precision asserts that its fraudulent misrepresentation claim is distinct from a trade secret claim because it implicates "Plaintiffs state of mind *at the time of contracting* and Precision's reliance in *entering* the relationship[.]" *See* Opp. at PAGEID ## 244–45 (emphasis in original). But that explanation steers further into preemption, not away from it. The claim itself states Precision's injurious reliance as disclosing supposed trade secrets to Plaintiffs, and the OUTSA specifically provides that acquisition of trade secrets by misrepresentation is acquisition by improper means, *i.e.* misappropriation. *See* Countercl., ¶ 53; Ohio Rev. Code § 1333.61. Even Precision, later in its Opposition, characterizes is fraud claim as a breach of this same duty. *See* Opp. at PAGEID ## 246–47 (describing the "alleged fraud" to entail a breach of "the duty not to

deceive Precision into disclosing its proprietary information[.]"). Accordingly, the fraud claim relies on the same operative facts as misappropriation under the OUTSA, establishing preemption.

Precision's discussion of its conversion claim fares no better. Precision now attempts to characterize the claim to be about "tangible property," despite that the claim itself references "tangible and intangible property." *See* Opp. at PAGEID # 245; *compare* Countercl., ¶ 61. Without any discussion of intangible property, Precision appears to concede preemption, at least to intangible property.

Precision's explanation of "tangible property" is also inconsistent in that the Counterclaims never describe anything tangible about "design packages." *Compare* Countercl. *to* Opp. at PAGEID # 245. But in any event, the entire claim remains preempted because the only alleged act of conversion is the reverse engineering Plaintiffs supposedly directed. *See* Countercl., ¶ 62. That further devolves the claim into one based entirely on the derivation of supposedly protected information, preempted by the OUTSA. *See Stolle Mach. Co., LLC v. Ram Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015) (OUTSA preempts "not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets[.]"); *see also Midwest Energy Consultants, LLC v. Util. Pipeline, Ltd*, 2006-Ohio-6232, ¶ 49 (Ct. App.) (conversion claim based on documents preempted, as value of documents was "nominal, apart from the information contained therein").

Accordingly, no portion of Precision's claims survive preemption.

*ii.* *<u>The Counterclaims' allegations foreclose any conversion of tangible property.</u>*

The Motion explains why Precision's conversion claim fails to the extent Precision means to rely on its reference to drawings or feeder units, even if it somehow survives preemption. *See* Mot. at PAGEID # 224, n. 12. Precision tries to brush those issues off as "fact questions reserved for a later stage," but in doing so, ignores that its own allegations, assumed true, rebut conversion.

*See* Opp. PAGEID # 245. The Counterclaims never allege that Plaintiffs possessed Precision's drawings to begin with, and in fact allege that Plaintiffs had to develop their own drawings. *See* Countercl., ¶ 10, ¶ 16. The Counterclaims further never allege that Plaintiffs ever acquired any Precision feeder units other than by purchasing them. *See id.*, ¶ 10. So, contrary to Precision's position, this issue is not a factual disagreement—it is that the Counterclaims' allegations themselves, assumed true, rebut the basic elements of conversion, rendering the statement of the claim itself implausible. *See* Mot. at PAGEID # 224, n. 12. In other words, the Counterclaims' own allegations defeat the conversion claim, without any further factual contest.

*iii.* *The MOU bars Precision's unjust enrichment claim.*

Precision briefly argues that its unjust enrichment claim is not barred by the MOU because the MOU's "coverage is disputed," and that "Plaintiffs themselves argue the MOU does *not* govern post-termination use [of trade secrets]." *See* Opp. at PAGEID ## 245–46 (emphasis in original). But that is not what Plaintiffs argue. *Compare* Mot. at PAGEID ## 226–27. Nor does the MOU's actual language leave a coverage question open, as it specifically states that any future license would be "on the basis of terms ***to be negotiated later***," expressly dispelling the existence of any agreement thereabout. *See* MOU, p. 4 (emphasis added). So while it dispels any agreement, the MOU does cover the licensing subject matter, thus barring the unjust enrichment claim.

*iv.* *Precision's fraudulent misrepresentation claim, as characterized by Precision, fails to plausibly state a claim.*

As the Motion notes, even if it was not preempted, Precision's fraud claim is defective because it relies on Plaintiffs representations as stated in the MOU, but the MOU lacks any statement that Plaintiffs would take a license from Precision. *See* Mot. at PAGEID # 225. Precision's Opposition only confirms that the claim fails for this reason. There, Precision relabels its fraudulent misrepresentation claim as a fraudulent inducement claim, alleging fraudulent

inducement to enter into the MOU. *See* Opp. at PAGEID # 246–47. It then points to the MOU to identify the contents of the supposed misrepresentation. *Id*. at PAGEID # 247.[9]

While pointing to the MOU's content may help Precision satisfy Rule 9's pleading standards, it exposes the claims failure of Rule 8's plausibility standards because the MOU simply does not state that Plaintiffs intended to take any license from Precision. Rather, as explained above and in the Motion, the MOU's statement as to licensing only implicates Precision and specifically dispels any commitment by Plaintiffs to take a license, given its express provision that any such license would be "negotiated later." *See* Section II.A.ii, *supra*; Mot. at PAGEID ## 213–14. Accordingly, Precision's fraud claim relies on representations Plaintiffs simply did not make, and Precision fails to state a claim for that reason.

For these reasons, Precision's Counts Five through Eight are both legally barred and implausible, and should be dismissed with prejudice.

### F. Precision's Claim for Declaratory Judgment Fails. (Count Nine).

Precision's only argument about its declaratory judgment claim is that its substantive claims should survive, so the declaratory judgment claim should too. *See* Opp. at PAGEID # 247–48. Precision is wrong for the reasons discussed above, and the Court should dismiss the declaratory judgment claim with the others.

## III. CONCLUSION

For the foregoing reasons and those in the Motion, the Court should grant Plaintiffs' Motion, dismiss all of Precision's counterclaims, and deny leave to amend as to at least Counts One, Two, Five, Six, Seven, and Eight.

---

[9] Though the Opposition asserts "the alleged fraud" somehow "occurred *before* and induced the MOU," neither it nor the Counterclaims allege a single fact related to any representation beyond those stated in the MOU itself. *See id.* at PAGEID ## 246–47 (emphasis in original); Countercl..

Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/ Michael A. Xavier*
Michael A. Xavier (0097121)
1775 Sherman St., Suite 2600
Denver, CO 80203
Phone: (303) 296-3996
michael.xavier@dinsmore.com

Matthew J. Bakota (0079830)
Callum S. Morris (0096817)
Emily M. Snively (0104656)
1 South Main Street, Suite 1300
Dayton, Ohio 45402
Phone: (937) 449-6400
matthew.bakota@dinsmore.com
callum.morris@dinsmore.com
emily.snively@dinsmore.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, a true and correct copy of the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, and served upon all parties of record via the Court's electronic filing system.

*/s/ Michael A. Xavier*